**REEDCO, INC. and Block Drug Company, Inc., Plaintiffs,**

v.

**HOFFMAN–LA ROCHE, INC., Defendant.**

Civ. A. No. 86–4555.

United States District Court,
D. New Jersey.

April 10, 1987.

Robert H. Epstein, Hannoch, Weisman, Roseland, N.J., Steven I. Weisburd, Marvin C. Soffen, Mark Garscia, Ostrolenk, Faber, Gerb & Soffen, New York City, for plaintiffs.

Ralph N. Del Deo, David J. Sheehan, Jeffrey P. Flynn, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., Bert A. Collison, Andrew Baum, Margaret Ranft, Nimus, Howes, Collison & Isner, New York City, for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

## INTRODUCTION

This is an action brought by Block Drug Company, Inc., an over-the-counter medicinal products company, and Reedco, Inc., a wholly-owned subsidiary of Block Drug, against Hoffman-La Roche, Inc., a pharmaceutical company, in which the plaintiff companies assert that defendant infringed one of plaintiffs' trademarks, in violation of the federal Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the N.J. law of trademark infringement and unfair competition. Plaintiffs make and market a line of over-the-counter medicated soaps and salves under the name "Tegrin," which are used for treatment of, among other afflictions, the symptoms of mild psoriasis. Defendant makes and markets "Tegison," a recently introduced oral prescription drug which is used to treat extreme and sometimes life-threatening cases of psoriasis, and which can cause serious side effects. Plaintiffs seek preliminary and permanent injunctions against defendant's use of the mark Tegison, compensatory and punitive damages, attorneys fees, and the cancellation of defendant's trademark registration for "Tegison."

Before me now is plaintiffs' request for a preliminary injunction which, first, prohibits defendant from making or marketing any psoriasis medicine under a name confusingly similar to the mark "Tegrin," including the Tegison medicine under the Tegison mark; second, prohibits defendant from filling any orders for Tegison; and third, compels defendant to deliver from destruction all advertising, packaging, and other material bearing the mark Tegison or any other name confusingly similar to

"Tegrin" which is used for a psoriosis medicine.

After considering all submissions, and the applicable law, I now decide plaintiffs' request for preliminary injunctive relief. I state below my findings of fact and conclusions of law in accordance with Fed.R. Civ.P. 52(a).

### JURISDICTION AND VENUE

Because plaintiffs allege a violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, this court has subject matter jurisdiction over the claims brought in this action under 28 U.S.C. §§ 1331 and 1338, 15 U.S.C. § 1121, and the doctrine of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The parties do not dispute that the court has personal jurisdiction over the defendant, and that venue is properly laid in this district.

### PRELIMINARY INJUNCTIVE RELIEF

In *SI Handling Systems, Inc., v. Heisley*, 753 F.2d 1244 (3d Cir.1985), the Third Circuit summarized the factors which a court must weigh in deciding whether to grant preliminary injunctive relief. They are "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary injunctive relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." 753 F.2d at 1254. *See, e.g., In re Arthur Treacher's Franchises Litigation*, 689 F.2d 1137 (3d Cir.1982); *United States v. Price*, 688 F.2d 204 (3d Cir.1982); *Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir.1982) (*en banc*). In considering whether to grant a preliminary injunction, the court may also consider the possibility of harm to other interested persons. *Spartacus, Inc. v. Borough of McKees Rocks*, 694 F.2d 947, 949 (3d Cir. 1982); *Kershner*, 670 F.2d at 443. All these factors apply when a party seeks to preliminarily enjoin the sale and marketing of pharmaceutical products under state and federal laws of unfair competition. *See SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1066–68 (3d Cir.1980). In deciding whether plaintiffs merit the preliminary injunctive relief they request, I shall consider these factors in turn.

*Reasonable Probability of Success on the Merits*

Whether plaintiffs have shown a reasonable probability of success on the merits turns on the substance of plaintiff's claims. Plaintiffs' complaint asserts that defendant's use of the mark Tegison constitutes trademark infringement, unfair competition, and false representation under the Lanham Act, unfair competition under N.J. S.A. 56:4–1 *et seq.*, unfair competition and trademark dilution under the N.J. common law, and a general violation of the N.J. Consumer Fraud Statute, N.J.S.A. 56:8–1 *et seq*. The parties agree that, to establish liability under any and all of plaintiffs' claims, plaintiffs must show that consumers may be confused by similarity between plaintiffs' mark Tegrin and defendant's mark Tegison. The parties disagree as to which is the proper legal standard of actionable confusion to apply in the case, and they disagree on the extent to which consumers may in fact be confused by any similarity between the parties' marks.

Psoriasis is a malfunction in the body's control of skin-cell division. Two to four million Americans suffer from psoriasis. In most cases, its symptoms are limited to small skin lesions, itching, and relatively minor discomfort. Psoriasis lesions on the scalp constitute one cause of dandruff. The Tegrin products made and marketed by plaintiffs are intended to treat these common, mild symptoms.

In some instances, psoriasis symptoms can be much worse than those which afflict the vast majority of psoriasis sufferers. Even the most common, and mildest, form of the disease—plaque psoriasis—can in some cases affect more than fifty percent of the surface area of the skin and cause cracking, bleeding, and infection. Worse is erythrodermic psoriasis, in which the plaques converge and the skin becomes in-

flamed, drawing blood to the surface and straining the heart. There can be edema, or swelling, in the joints, and there is constant fatigue. Worst of all is pustular psoriasis, in which microabcesses form and there is constant danger of infection. Severe forms of psoriasis are disabling—that is, patients are disfigured and unable to work or lead normal social lives. In its most severe forms, the disease can result in death.

It is not clear how many people suffer from the more extreme, more crippling manifestations of the disease. The National Psoriasis Foundation, which dedicates its efforts to the needs of severe psoriasis victims, has 11,000 members. Other materials disclosed through discovery in this case suggest that many thousands more may suffer similar affliction. The Food and Drug Administration has stated that there may be as many as 80,000 Americans afflicted with severe psoriasis whose conditions have not responded to the therapies available prior to Tegison.

There are several standard forms of treatment for severe psoriasis; plaintiffs' Tegrin products are not among them. As noted above, there are some patients who are unresponsive to, or intolerant of, these standard therapies. It is among these patients, who suffer in the extreme, that the availability of defendant's Tegison product has been most eagerly awaited.

As previously noted, Tegison is a prescription medication, known generically as etretinate, which has been available on the market since November 1986. It is taken orally. It is not a drug that can be prescribed casually, for it can cause serious side effects. Among the possible side effects identified by the Food and Drug Administration at the time Tegison was approved for sale are liver damage, corneal changes, bone spurs, and serious birth defects in the children of patients who use or have recently used Tegison. Because of these dangers, Tegison is properly prescribed only when the patient's condition is severe and recalcitrant; where other therapies have failed; where the patient has been informed of and acknowledges the possible side effects; and after a complete base line laboratory study has been completed, including spinal x-rays, an eye examination, blood workup, and liver, kidney, and bone-marrow function tests. Consequently, the number of patients who need Tegison, and can and will take it, is thus relatively few. For those who need and can use Tegison, however, it can dramatically improve their conditions. In some cases, it may save lives. Tegison is thus effective in combatting a crippling affliction in people whose conditions have previously resisted alternative forms of treatment. For those people, Tegison is a breakthrough drug.

The Tegrin name is a registered trademark which enjoys national recognition. Plaintiff Reedco is the owner of U.S. Trademark Registration No. 747,497 for the mark Tegrin, as used to identify plaintiffs' topically applied medicinal preparations for the treatment of psoriatic skin conditions. Plaintiff Reedco also owns U.S. Trademark Registration No. 939,049 for the mark Tegrin, as used to identify plaintiffs' medicated bath soap and hair shampoo.

The trademark Tegrin has been used continuously and exclusively on a nationwide basis by plaintiffs since 1962.

Tegrin skin cream, the first of the Tegrin line of medicated products, was introduced in 1962. Tegrin line was expanded in 1966 with the introduction of Tegrin medicated shampoo. The shampoo was originally sold in cream form only and had a scent which plaintiffs refer to as "regular" scent. A medicated Tegrin soap was added to the line in 1970. This was followed by the introduction of Tegrin medicated shampoo in lotion form in 1973. A herbal scent was added to both the cream and lotion forms of the medicated shampoo in 1976. The product line was expanded in 1979 to include Tegrin skin lotion. A gel form of the medicated shampoo was introduced in 1986.

Plaintiffs' Tegrin trademark is one of the better-known brand names among medicated personal care products. The mark has been extensively promoted since 1962. Plaintiff's television commercials have been running on an ongoing basis since the in-

troduction of the Tegrin line. In the last five years alone, television commercials for plaintiffs' Tegrin products have been broadcast in all 213 television markets throughout the United States, appearing on such well known shows as Monday Night Football, Super Bowl XX, Wide World of Sports, Wheel of Fortune, The Young and the Restless, and Ryan's Hope. As a result of this extensive television advertising, over 615 million commercial impressions (the number of commercials multiplied by the number of households reached by each commercial) of the Tegrin products have been aired over the last five years. From April 1985 through March 1986 alone, over 100 million commercial impressions for Tegrin products have been aired. As a result of this advertising, it is estimated that approximately 95% of all adults in the United States have been exposed to Tegrin advertising over the last five years. On the average, it is estimated that each adult has been exposed to 41 Tegrin commercials during this 5–year period.

While plaintiffs have relied primarily on television advertising for their Tegrin products, they have also promoted Tegrin brand products through the print media. It is estimated that these print advertisements reached over 39 million homes in 1985 alone. In addition, Tegrin products are sold in over 180,000 retail locations throughout the United States, almost half of which are pharmacies, and are undoubtedly seen on retailers' shelves by millions of consumers shopping for shampoo and skin care products.

During the period from 1967 through 1986 total the advertising expenditure for Tegrin medicated products has topped 66 million dollars, or approximately 39% of plaintiff Block Drug's total sales. Advertising expenditures for the last five years alone have exceeded 16.5 million dollars, or approximately 36% of plaintiff Block Drug's sales for those years. Plaintiffs' advertising expenditures have been high in terms of both total dollars expended and advertising expenses expressed as a percentage of sales.

Since the introduction of Tegrin skin cream in 1962, plaintiffs have sold over 100 million units of its Tegrin products at a total wholesale value well in excess of 170 million dollars. Sales over the last five years have been over 25 million units, at a total wholesale value exceeding 46 million dollars.

As a result of the foregoing advertising and consumer exposure to plaintiffs' Tegrin products at retail locations, plaintiffs' Tegrin mark has become very well known and has achieved significant consumer recognition. The strength of the Tegrin mark is evidenced by the magnitude of plaintiffs' sales of Tegrin products and by the success rate of each newly introduced Tegrin product.

Exactly what the Tegrin trademark connotes to consumers is not clear from the evidence at hand. In the late 60's and early 70's plaintiffs conducted an agressive ad campaign based on the "tag line" "The Heartbreak of Psoriasis." In 1973, plaintiffs' advertising strategy shifted, and Tegrin shampoo, the most heavily advertised of the Tegrin products and apparently the only Tegrin product given television exposure, was toated on television as a treatment for dandruff caused by "eczema, seborrhea, or psoriasis." Then, from 1976, when Tegrin's herbal scent was introduced, until 1985, Tegrin shampoo was advertised on television as a treatment for "problem dandruff," with no mention made of psoriasis. Finally, in 1985 and 1986, TV advertising based on the old "dandruff caused by 'eczema, seborrhea, or psoriasis'" phrase occasionally reappeared. Throughout this time, print advertisement and packaging for Tegrin shampoo and the other Tegrin products generally made mention of psoriasis, either alone or in conjunction with dandruff, eczema, and seborrhea. Given this evidence, I find that the well-known Tegrin trademark is generally associated with a shampoo and other products which are designed to treat a number of apparently related conditions: dandruff or "problem" dandruff, eczema, seborrhea, and psoriasis. Psoriasis is therefore one of the afflictions associated with the Tegrin mark, but not the only one.

The Tegison name is a registered trademark in both the United States and Canada. Defendant finalized the registration of Tegison in the United States on November 22, 1983, under Trademark Registration No. 1,258,211. The Canadian registration for Tegison was issued on December 21, 1984. Defendant sells its drug under the name "Tigason" in countries other than the United States and Canada. Defendant chose to market the drug as "Tegison" in the United States and Canada because the name Tigason was similar to a United States and Canadian drug called "Tigan." Tigan is a prescription anti-nausea drug sold in capsule form, like defendant's drug. Tigan can be used by pregnant females, but defendant's drug must not be so used. To avoid the danger of such use as a result of confusion between Tigan and defendant's drug, defendant opted for the mark Tegison in the United States and Canada, a mark which defendant felt was both similar to Tigason and readily distinguishable from Tigan.

Among doctors and patients and other laymen familiar with severe psoriasis, Tegison appears already to be known as an effective new treatment for victims of severe psoriasis with nowhere else to turn. From July 1984 through November 1986, Tegison received publicity in a number of medical and pharmaceutical specialty publications, including *F-D-C Reports*, the *New England Journal of Medicine*, the *Journal of the American Academy of Dermatology*, and *Drug Topics*. Most of the publicity referred to defendant's drug as both Tegison and etretinate, its generic name. Tegison's effectiveness and its side effects were discussed. This publicity apparently engendered a great deal of excitement among the groups of people who would prescribe Tegison or use it themselves; it has been a topic of much discussion at annual meetings of dermatologists for a number of years, and victims of severe psoriasis have written to defendant, the National Psoriasis Foundation, and a number of prominent dermatology clinics for more information. During part of this period of publicity, Tegison became available in Europe and Canada but not in the United

States. Some United States patients traveled abroad in order to undergo Tegison treatment.

In addition to this publicity within the narrow circles of severe psoriasis sufferers and physicians, there has been reporting on Tegison in the general press. The AP, UPI, and Reuters news services have all offered stories discussing Tegison as a new treatment for severe psoriasis, and have discussed Tegison's possible side effects. The Wall Street Journal, the Washington Post, U.S. News & World Report, and the Los Angeles Times have all run stories on defendant's drug, discussing its side effects and the fact that it is designed to treat extreme, recalcitrant, "disfiguring" forms of psoriasis.

With the exception of the following, plaintiffs have offered no evidence as to whether any of this publicity regarding Tegison and its side effects has fostered actual confusion between Tegrin and Tegison. That exception involves a radio report heard by the president of a subsidiary company of plaintiff Block Drug. On November 6, 1986, the president heard on his car radio a report that people suffering from the "Heartbreak of Psoriasis" would now have to deal with bone spurs. Those who broadcast this report may have honestly confused news regarding Tegison with Tegrin and its old advertising "tag line," or they may have simply appropriated the old phrase without thinking of or intending to evoke the Tegrin name itself, in order to make a story about psoriasis sound more familiar or important to more people. In any event, it is a remote possibility that some of the people who heard the story might have recalled the old Tegrin advertising phrase and associated the news of Tegison side effects with Tegrin products. Plaintiffs have not, however, submitted any evidence showing actual confusion, loss of sales, or loss of good will as a result of the radio report.

The name Tegison itself does bear some similarity to the name Tegrin. Both names begin with the same 3 letters, and thus the same initial one-syllable sound, "Teg."

The overall similarity between the names, however, is not strong. Although Tegrin and Tegison are the only psoriasis-related products to both start with "Teg," there are a number of other medical products which start the same way. The 1986 Physicians' Desk Reference lists Tegretol as a medication for epilepsy; its possible side effects include "serious and sometimes fatal deformaties of blood cells." Also listed is Tegopen, an antibiotic which can produce fatal hypersensitivity in persons allergic to penicillin. The 1986 Drug Topics Red Book lists a whole line of pharmaceuticals from Ortega Pharmaceutical Co. with names such as Tega-Cort, Tega-Drill, Tega-Nill and Tega-Span. Plaintiff Block Drug's own application to register Tegrin was initially refused based on a prior registration for "Tegamin," a "preparation for the external treatment of skin disorders." Plaintiff Block overcame the refusal by arguing that the 2 marks looked and sounded different and that "Tegamin" had already been allowed over another trademark for a skin preparation named "Teganor." Block cited a dictionary definition of the word "tegament" in support of the contention that "teg" generically designates things "related to skin." Beyond use of the initial "teg" syllable, the 2 names are different. Plaintiffs have offered no evidence to show any actual confusion between the names themselves, whether seen or heard.

Finally, I note that defendant's drug has been available in Canada under the name Tegison for two years. During that time, plaintiffs have marketed Tegrin products in Canada. Plaintiffs have produced no evidence whatsoever of any actual confusion between Tegrin and Tegison in Canada. Exactly how much weight to accord to this omission is not clear, because the parties have failed to provide the court with evidence regarding the Canadian market for each drug—for example, whether Tegrin is a strong or weak mark in Canada, whether Tegrin is advertised in Canada as it is in the United States, and whether Tegison and its side effects have received any publicity in Canada.

Having found these facts, I now turn to the applicable law regarding confusion.

There are ten factors to consider when deciding whether confusion exists between noncompeting goods. These are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of the public because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a produce in the defendant's market.

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978).

When I consider the facts previously set out in terms of the *Scott Paper* factors, I reach the following conclusions. Tegrin is a very strong mark, which bears a small degree of visual and aural similarity to the later-coming mark Tegison. In adopting the mark Tegison, defendant did not intend to promote confusion between its product and Tegrin products. Nevertheless, because Tegrin and Tegison are both products which bear some association to a disease named psoriasis, there is a remote possibility that confusion between the names might arise.

There are, however, vast differences between the Tegrin and Tegison products. They are dissimilar in form; the Tegrin name applies to a line of over-the-counter salves and soaps, and Tegison is an oral

prescription drug. Tegrin can be purchased in a variety of retail outlets by anyone who wants it; Tegison must be prescribed by a doctor, should only be prescribed after extensive medical tests, and usually will be prescribed only after the failure of alternative therapies. Tegrin treats a common skin problem; Tegison treats an acute, unusual health risk of life-ruining proportions. These differences make Tegrin and Tegison instantly distinguishable to any consumer who knows anything about the form in which the products are available, the means by which they can be acquired, the nature of the afflictions for which they are used, the ways they are used, or the people who use them.

Therefore, the remote possibility of confusion created by the similarity in names is limited to the following instance. A consumer or potential consumer of Tegrin, who has no knowledge of severe psoriasis as an unusual and dangerous physical affliction, may hear or read about Tegison or a new treatment for severe psoriasis and hear about its threatened side effects, and might possibly be confused by the small degree of similarity between the nemas Tegrin and Tegison, such that he or she would think that Tegrin has such side effects, and would therefore avoid using Tegrin. Such confusion might conceivably have occurred, for example, among some of the people who prepared or heard the radio report described by the president of the Block Drug subsidiary. I note, however, that plaintiffs have failed to produce any evidence of actual confusion, lost sales, or lost goodwill, despite the fact that Tegrin and Tegison have coexisted in Canada for two years, that negative publicity in the United States regarding Tegison has already been circulated, and that at least one United States radio report used an old Tegrin advertising phrase in a story about Tegison side effects.

Aside from the remote possibility of confusion in the instance described above, confusion is wholly unforeseeable. No one would possibly confuse the Tegrin products themselves with a prescription bottle of Tegison pills. Any person who knew more about Tegison than the fact that it was a treatment for severe psoriasis which threatened severe side effects—for example, that Tegison was a prescription drug or that it was taken orally—would not confuse it with Tegrin. And anyone who had some knowledge of severe psoriasis as an affliction distinct from common psoriasis, including any person who suffered from severe psoriasis or was an acquaintance or relative of a severe psoriasis victim, would not confuse Tegison with Tegrin.

In an effort to suggest that the threat of confusion is broad, or entails serious risks of life and limb, plaintiffs contend that a mild-psoriasis sufferer living with a severe-psoriasis victim might use the victim's Tegison. Were that to happen, it would not be because the sufferer confused the drugs. Tegrin and Tegison are readily distinguishable to anyone with the rudimentary knowledge described above, including anyone who saw the Tegison prescription bottle or who was aware of the unusually dangerous and debilitating affliction for which the Tegison had been prescribed. Any misuse of Tegison by a mild-psoriasis sufferer would occur only because that sufferer was personally negligent or reckless enough to use the prescribed medicine of a seriously ill patient without consulting a doctor.

■ In short, I conclude that nothing more than a remote possibility exists that Tegrin and Tegison might be confused, and then only in the narrow instance described earlier. Given this conclusion, I further conclude that plaintiffs have failed to show a reasonable probability of succeeding on the merits of their claims. In order to establish liability, plaintiff must show that a "likelihood of confusion" exists between plaintiff's mark Tegrin and defendant's mark Tegison. A likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper,* 589 F.2d at 1229. *See, e.g., Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 851 and 854 (3d Cir. 1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct.

2678, 86 L.Ed.2d 696 (1985); *SK & F*, 625 F.2d at 1063 and 1065. Given my conclusion, under the *Scott Paper* factors, that there is only a possibility that Tegrin and Tegison might be confused, and then only in the narrow instance described earlier, it follows that plaintiffs have failed to meet the "likelihood of confusion" standard.

■ Plaintiffs have argued that the proper test for liability in this case is indeed whether a mere "possibility" of confusion exists between Tegrin and Tegison, rather than a likelihood of confusion. In support of their position, plaintiffs cite *Morgenstern Chemical Co. v. G.D. Searle & Co.*, 253 F.2d 390 (3d Cir.), *cert. denied*, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958). In *Morgenstern*, the Third Circuit held that the less stringent "possibility" test should apply in cases where confusion between medicines was alleged, because "confusion in such products can have serious consequences for the patient." 253 F.2d at 393. I decline to apply *Morgenstern* to the case at hand, for a number of reasons. First, the *Morgenstern* court was concerned with the danger facing patients who might have the wrong drug administered to them. As is clear from my discussion of the facts above, there is in my opinion no danger of defendant's product being used in place of plaintiffs', or vice versa, as a result of trademark confusion. The only harm at stake in this case is the remote possibility that plaintiffs will suffer typical trademark-infringement harms, such as lost sales. Second, the Third Circuit itself has never repeated its use of the *Morgenstern* "possibility" rule. Even in cases where separate name-brand and generic prescription drugs bore a confusingly similar resemblance to each other, so that doctors, pharmacists, and patients might all confuse the drugs in use, the Third Circuit after *Morgenstern* has applied the "likelihood of confusion" test. *See, e.g., Ciba-Geigy*, 747 F.2d at 851 and 854; *SK & F*, 625 F.2d at 1063 and 1065. *See also American Cyanamid Corporation v. Connaught Laboratories, Inc.*, 800 F.2d 306, 310 (2d Cir.1986), where the Second Circuit recently considered and refused to apply the *Morgenstern* rule in a case in which the

unintended use of one drug instead of another, similarly named drug, could only have resulted form the "spectacular incompetence" of a physician or nurse.

In short, plaintiffs have failed to show a reasonable probability of success on the merits of their claims because they have failed to show that consumers are likely to confuse Tegrin and Tegison.

*Harm to Other Interested Persons*

■ In addition to plaintiffs' failure to show a reasonable probability of success on the merits, there is another, independent reason to deny plaintiffs the relief they request. In this case, such a great deal of harm would flow to users and potential users of Tegison from a cutoff of the drug that plaintiffs' requested relief could not be justified.

As plaintiffs acknowledge in their reply brief, an injunction compelling the destruction of all material marked "Tegison" would compel the destruction of all Tegison capsules, each of which bears the Tegison mark. This, combined with commands that defendant stop making Tegison and stop filling orders for Tegison, would end the supply of Tegison to patients once patients' and doctors' on-hand supplies were depleted.

Defendant submitted affidavits in support of its claim that a new inventory of the drug under a new name could not be ready for shipment for three months. Those three months of interrupted supply would visit a grievous burden on Tegison users. Psoriasis in its severe forms is a disfiguring, disabling, and sometimes life-threatening disease. People so afflicted are often confined to their homes, unable to work, disabled socially, and hampered by difficulty in using their limbs and moving their joints. Sometimes, complications lead to death. Tegison can relieve these hardships when other therapies have failed. To restrict or cut off its supply for any significant amount of time would prevent new patients from receiving the treatment they need so badly, current patients from continuing their treatment, and past patients

from falling back on the drug when their disabling condition threatens to recur.

In contrast, to deny plaintiffs the relief they request would do no more than raise the remote possibility that plaintiffs will suffer such typical trademark-infringement injuries as lost sales. In stark contrast stand the harms which people in need of Tegison would suffer. Thus, it would clearly be inequitable to award plaintiffs the preliminary relief they request.

### The Public Interest

Similarly, it would pervert the public interest embodied in the laws of trademark infringement and unfair competition to enforce those laws in the manner requested by plaintiffs, and thereby cause the enormous harm to users and potential users of Tegison which I have described above. Thus, the public interest presents a third independent reason why plaintiffs' request for relief must be denied.

### Implications of Plaintiffs' Delay in Seeking Relief

Plaintiffs apparently delayed taking action against defendant for their claims in this case. Such delay is relevant to a determination of irreparable harm, another requirement for preliminary injunctive relief which plaintiffs must establish. Before any further discussion of the issue of irreparable harm, however, I shall consider whether plaintiffs' delay provides defendant with a defense of laches.

In July of 1985, plaintiffs received actual notice that a drug named Tegison, intended for use against severe psoriasis and capable of producing severe side effects, was well on the way to FDA approval and then, presumably, commercial distribution. On June 24, 1985, the Dermatalogic Drugs Advisory Committee of the FDA recommended approval of Tegison etritinate. This fact was reported in the July 1, 1985 edition of *F-D-C Reports* (the "Pink Sheet"), in an article which discussed the possible adverse side effects of the drug. The FDA usually follows the recommendations for approval made by this Advisory Committee. David Schuman, Esq., plaintiffs' trademark counsel, reviewed this Pink Sheet item and forwarded a copy to James Iseman, the Tegrin product manager. Mr. Iseman appended it to a handwritten memo of July 26, 1985 and circulated to six of plaintiffs' employees, including three vice-presidents. On August 15, 1985, Bill Duggan, plaintiffs' account executive at its advertising agency, wrote a memorandum to Jerry Pecoraro, then Group Product Manager for Tegrin products at Block Drug, with copies to Mr. Iseman and five others. The memo attached a copy of an article from the August 5, 1985 edition of *Drug Topics*, a trade publication, concerning Tegison and its side effects. The Agency's memo recommended "that legal avenues be considered (e.g., trademark infringement) to determine whether it might be possible to force Roche to change the name of their product." On August 20, 1985, Mr. Iseman wrote a memo to John Perry, Block Drug's Vice-President for Marketing, with copies to eight others, including Mr. Duggan, stating that no legal action would be taken at that time. The memo cited reasons for waiting which Mr. Iseman attributed to plaintiffs' legal advisors. Plaintiffs consider these citations to be hearsay, and object to their consideration by the court at this time.

I note that in addition to the actual notice to plaintiffs described above, the existence of significant publicity at earlier times regarding, first, defendant's application for registration of the name Tegison and, second, the nature of the Tegison drug and its side effects, establishes the strong possibility that plaintiffs knew about Tegison, its uses, and its dangers long before July, 1985.

In March, 1982, defendant's Canadian affiliate, Hoffman-La Roche Limited, filed an application in the Canadian Trade Marks Office to register Tegison for a "pharmaceutical preparation ... for the treatment of psoriasis and hyperkeratotic disorders." Roche Canada's trademark was published in the Canadian Trade Marks Journal of January 11, 1984. Plaintiffs did not oppose. The Canadian registration for Tegison was issued on December 21, 1984. Meanwhile, Roche Canada's Tegison product was formally introduced in Canada in

September, 1984. As noted earlier, no evidence has been submitted regarding confusion in Canada between Tegrin and Tegison. On August 30, 1983, defendant's application for Federal registration of its trademark Tegison for "a preparation for the treatment of chronic dermatological disorders—namely, psoriasis" was published in the Official Gazette of the U.S. Patent and Trademark Office. The application had been filed on June 11, 1982. Plaintiffs receive, and Mr. Schuman regularly reviews, the Official Gazette. Plaintiffs did not oppose registration or notify defendant that it had any objection. Finally, from June, 1984 to October, 1986, as described earlier, Tegison and its side effects received significant publicity in medical and pharmaceutical circles.

On October 7, 1986, over 15 months after plaintiffs' actual notice described above, and over 4½ years after the earliest notice plaintiffs might reasonably have received regarding Tegison, the FDA announced approval of Tegison for sale, and issued a press release discussing its uses and its potential side effects. Following the FDA release, Tegison and its side effects were publicized in the general press, as described earlier. On November 17, 1986, as publicity continued, plaintiffs filed their complaint against defendant. At that time, and in accordance with pharmaceutical industry practice, defendant had already readied its initial shipments of Tegison and had laid plans for a significant promotional effort aimed at the medical community. Defendant made its first shipment of Tegison on November 19, 1986 and began its promotional campaign in December 1, 1986. On December 24, 1986, plaintiffs applied for an order to show cause why preliminary injunctive relief against defendant should not issue.

Laches is a defense to the issuance of an injunction, available when, in light of all the existing circumstances, it appears that a plaintiff has unreasonably delayed application for relief and prejudice to opposing parties has thereby resulted. *Sobosle v. U.S. Steel Corp.*, 359 F.2d 7, 12–13 (3d Cir.1966). *See Mansfield Area Citizens Group v. United States*, 413 F.Supp. 810,

824 (M.D.Pa.1976), and cases cited therein. The laches defense may apply in suits for trademark infringement. *See Circus Playhouse, Inc. v. Circus Towne Pizza Theater, Inc.*, 224 U.S.P.Q. 573, 574 (E.D.Pa. 1984) [Available on WESTLAW, DCT database]; *see also 2 McCarthy, Trademarks and Unfair Competition* §§ 31:1–31:14.

■ Defendant has a valid laches defense against the entry of the injunctive relief requested. Plaintiffs offer no reasonable explanation for filing their request for relief as late as they did. Plaintiffs admit that in July 1985, they knew about the recommendation to the FDA that Tegison be approved. They claim that they did not take action at that point because Tegison's possible side effects "were so extensive and devastating" that it was not unreasonable to anticipate ultimate FDA disapproval. Thus, plaintiffs took the chance that Tegison's side effects would be so "devastating" that the FDA would depart from a recommendation that Tegison be approved. Plaintiffs did nothing to protect its interest or defendant's against the possibility that Tegison's side effects, although "devastating," would not prove devastating enough to prevent the sale of the drug. I find such lassitude to be unreasonable. It becomes progressively less reasonable after October 7, 1986, when the FDA granted approval to Tegison; after November 8, 1986, when negative publicity, including the radio report, had gone out; and after November 19, 1986, when defendant first shipped Tegison. In spite of these events, plaintiffs held off in applying for preliminary injunctive relief until December 24, 1986, a date which was clearly too late to be reasonable. I note that plaintiffs apparently have not used the time spent in delay to develop evidence of actual confusion, even in Canada, where Tegrin and Tegison both were marketed long before July, 1985.

Defendant has argued that plaintiffs' delay also refutes any contention by plaintiffs that the harm plaintiffs allege is irreparable. Plaintiffs must show irreparable harm to demonstrate their eligibility for preliminary injunctive relief in the first place.

Both the value of a trademark to its owner and damage which can be wrought against a trademark are to some extent intangible. This intangibility leads many courts to find irreparable injury in trademark cases as a matter of course, once a strong showing of probable success on the merits has been made. *See Bagdasarian Productions v. Audiofidelity Enterprises,* 225 U.S.P.Q. 53, 57 (D.N.J.1984), [Available on WESTLAW, DCT database], *aff'd mem.,* 772 F.2d 893 (3d Cir.1985); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 429–430 (S.D.N.Y.1980). Nevertheless, an allegation of irreparable harm may be undercut by evidence that the moving party exhibited delay in seeking relief. *See Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 9 (2d Cir.1985), *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984). *See also Skehan v. Board of Trustees,* 353 F.Supp. 542, 543 (M.D.Pa.1973).

Given my determinations that plaintiffs have failed to show a reasonable probability of success on the merits, that harm to others and to the public interest prohibits approval of plaintiffs' request, and that a laches defense is in any event warranted, I find it unnecessary to consider whether plaintiffs' alleged injuries are properly considered irreparable, and whether the delay described earlier vitiates any claim of irreparable harm in this case.

For the same reason, I find it unnecessary to consider whether another prerequisite to preliminary injunctive relief, the equitable balancing of hardships between the parties, has been met.

### Summary

In short, I deny plaintiffs' request for preliminary injunctive relief. Plaintiffs have failed to demonstrate a reasonable probability of success on the merits of their claims. In addition, I deny plaintiffs' requested relief due to the certainty of inordinate harm to current and potential Tegison users, and to the public interest. Finally, I deny plaintiffs' requested relief because plaintiffs' delay in seeking relief against defendant provides defendant with a valid defense of laches.