**WARNER LAMBERT COMPANY, Plaintiff,**

v.

**McCRORY'S CORP., etc., Defendant.**

Civ. A. No. 89–2437.

United States District Court, D. New Jersey.

July 28, 1989.

As Amended Aug. 17, 1989.

Keith A. Kraus, Liza M. Walsh, Connell, Foley & Geiser, Roseland, N.J. for plaintiff.

Marc Phillip Bodner, Martin P. Michael, Deborah J. Stavile, Kyle–Beth Basson, Rubin, Baum, Levin, Constant & Friedman, New York City, and Allyn Lite, Goldstein, Till, Lite & Reiken, Newark, N.J., for defendant.

## OPINION

WOLIN, District Judge.

Plaintiff Warner–Lambert Company ("Warner–Lambert") brings the instant motion for a preliminary injunction against defendant McCrory Corporation's ("McCrory") sale of an unflavored medicinal mouthwash product in a trade dress that allegedly infringes upon the trade dress of plaintiff's product Listerine Antiseptic ("Listerine") in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and N.J. S.A. 56:4–1. For the reasons set forth below, plaintiff's request for preliminary injunctive relief will be denied.

## I. BACKGROUND

Plaintiff Warner–Lambert is a Delaware corporation principally based in Morris Plains, New Jersey. Among its many products, Warner–Lambert manufactures, markets and sells an unflavored, amber-colored, antiseptic mouthwash known as Listerine, which was first introduced in 1879, and now is the largest selling mouthwash in the United States today, maintaining approximately a 26.5% market share of the total mouthwash market. During 1988, plaintiff's factory sales of this product were in excess of $172 million. Listerine faces competition from no other major manufacturer in the unflavored, antiseptic mouthwash category. To promote and advertise Listerine, Warner–Lambert has expended in excess of $385,500,000.00 over the past ten years, including $49 million in 1988 alone.

Since 1976, Listerine has been packaged in a clear, "bar-bell" type waisted bottle [1] with a black cap and a white, rectangular label with black lettering on the waist of the bottle, and the amber liquid prominently displayed. The bar-bell bottle represented a slight modification from the "Boston Round" bottle used prior to 1978. Warner–Lambert claims the modification was

---

1. Plaintiff refers to the Listerine bottle as "bar-bell" shaped, while defendant describes the shape as "waisted." Both terms are used interchangeably in this opinion.

done for the sole purpose of creating a more distinctive marketing image for Listerine. Despite this importance Warner–Lambert places on Listerine's bottle shape, at the point of retail sale Listerine bottles are supposed to be sold in a khaki-colored cardboard overwrap that has a yellow label. Plaintiff contends, however, that the focus of the advertising and promotion of Listerine, and the point of consumer identification with the product, is the unwrapped bottle, which is displayed in all print advertising and for 70% of the time in the product's T.V. ads.

Although Listerine faces no other single major competitor, similar mouthwash products have been manufactured for sale in the private label market. Private label products are sold by retailers, with the retailer's own name often on the product. Some of the nation's largest retailers sell private label amber mouthwash. For example, K–Mart Corporation ("K–Mart") has been selling its private label amber mouthwash for four years. Noble Affidavit, ¶ 2. Revco U.S., Inc. ("Revco") has been selling its private label brand amber mouthwash for six years. Biarsky Affidavit, ¶ 2. Both the Revco and K–Mart amber mouthwashes are packaged in 32 ounce bar-bell shaped bottles with black caps. Also packaged in bar-bell shaped bottles and before the Court as exhibits are the private label amber mouthwash brands of CVS Stores, Treasury Stores, People's, Rite Aid, Good Health, as well as defendant McCrory. Examples of private label amber mouthwash packaged in other than bar-bell shaped bottles are Parklane, "Amber" Mouthwash (sold in Publix stores) Rite Aid (16 ounce bottle), Pathmark and Woolworth. Of these, only the Publix brand is in a 32 ounce size.[2]

Retailers purchase their private label brands from specialized manufacturers. Two of the largest suppliers of private label mouthwash products are L. Perrigo Company and Cumberland–Swan, Inc., from which McCrory purchases the amber mouthwash in dispute here. Officers from

the two companies have averred that their companies have manufactured amber mouthwash in bar-bell shaped bottles for six and three years, respectively, without receiving any warning from Warner–Lambert until recently. Olesnavage Affidavit, ¶ 3–9; Jones Affidavit, ¶ 3.

In early 1988, defendant McCrory apparently decided to develop a private label amber mouthwash product. McCrory presently operates approximately 1,300 retail stores. McCrory claims to have surveyed the current state of the private label mouthwash market and determined the industry-standard for the trade dress of unflavored mouthwash to be a waisted clear bottle combined with amber liquid. McCrory's private label medicinal, unflavored mouthwash was eventually packaged in such a trade dress, with the name "Antiseptic Mouthwash," except that McCrory added a yellow wrap-around label with a self-awarded McCrory "prize ribbon" seal of approval. McCrory places its private label amber mouthwash on shelves with Listerine under a "compare and save" sign. That is supposed to alert consumers to the price difference between Listerine, which sells for approximately $4.29, and McCrory's private label brand, which sells for approximately $1.69.

McCrory's began selling its own label amber mouthwash in June 1988. On January 26, 1989, counsel for Warner–Lambert wrote to McCrory objecting to McCrory's trade dress for its private label amber mouthwash. Warner–Lambert contends this letter was prompted by the inability of Warner–Lambert's own counsel to recognize Listerine at a McCrory's store. Plaintiff states: "This was the first time that Warner–Lambert had knowledge regarding an infringement of the Listerine trade dress by McCrory's or anyone else." Plaintiff's Brief in Support of Preliminary Injunction, p. 6. However, this claim is somewhat contradicted by the deposition testimony of Lynne Millheiser, Warner–Lambert's Category Director for oral care prod-

---

**2.** The Court takes note of the fact that the private label brands marked for exhibit for purposes of this motion for a preliminary injunction do not represent an exhaustive canvassing of the private label market in amber mouthwash.

ucts, who, when asked "How long have you been aware of the sale of private label amber mouthwash in bottle shapes with waisted middles?", responded, "Approximately ten years." Millheiser Deposition at p. 122.

McCrory responded to Warner–Lambert's January 26 letter by merely changing the white background on the product's label to a shade of yellow. On February 26, 1989 Warner–Lambert notified McCrory that it considered the change to be insignificant. McCrory rejected Warner–Lambert's further demands in a letter dated March 16, 1989. Warner–Lambert then commissioned a consumer survey by the Guideline Research Corporation to ascertain the extent of any consumer confusion between Listerine and McCrory's private label brand amber mouthwash. On June 6, 1989, plaintiff commenced this action and simultaneously moved for a preliminary injunction against McCrory's sale of its private label amber mouthwash. It is this motion that is now before the Court.

## II. DISCUSSION

### A. *Standard for Preliminary Injunction*

Before a district court may issue a preliminary injunction in the Third Circuit, the Court must be satisfied that plaintiff is likely to prevail on the merits, that it will suffer irreparable harm absent such relief, and that the balance of equities and the public interest favor injunctive relief. *See American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1140 (3d Cir. 1986); *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 150–51 (3d Cir. 1984).

The Court will consider each element of the test in turn, beginning with the issue of Warner–Lambert's irreparable harm, which the Court finds to be of particular significance.

### (1) Irreparable Harm

Of all the prerequisites for the issuance of a preliminary injunction, a demonstration that the movant is likely to suffer irreparable harm is perhaps the most important. *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp,* 719 F.2d 42, 45 (2d Cir.1983). This is entirely appropriate given the often drastic consequences that can entail when a court employs its coercive powers on the basis of a preliminary and incomplete factual record.

■ In a trade dress infringement action, irreparable harm will often be presumed if a plaintiff can make an adequate showing of the likelihood of consumer confusion. *See Citibank, N.A. v. City Trust,* 756 F.2d 273 (2d Cir.1985); *GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir.1984). Any such presumption, however, will be rendered inoperative in cases where a plaintiff has delayed in seeking relief for a perceived infringement. *Citibank, N.A.,* 756 F.2d at 276. Whether this delay is viewed under the theory or laches or implied acquiescence, significant delay in bringing an action and applying for injunctive relief "undercuts any presumption that infringement alone has caused irreparable harm *pendente lite;* therefore, such delay may justify denial of a preliminary injunction for trademark infringement." *GTE Corp.,* 731 F.2d at 678. *See also Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y.1979) ("Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest that there is, in fact, no irreparable injury.").

The case at bar presents two types of delay that may evince a lack of irreparable harm. First, there is the matter of Warner–Lambert's failure to move against other retailers that have been selling amber mouthwash in waisted bottles for a number of years. Second, there is the question of Warner–Lambert's delay in bringing the present action against McCrory's alleged infringement on the Listerine trade dress.

### (a) *Warner–Lambert's Inaction Towards Other Retailers Selling Private Label Amber Mouthwash*

■ Defendant has submitted evidence demonstrating that some of the nation's largest retail store chains have, for a peri-

od from three to at least six years, distributed and sold amber mouthwash in waisted bottles. Plaintiff, through an employee, has admitted to having had actual knowledge of such private label brands for ten years, Millheiser Dep., p. 122; yet plaintiff took no action against any private label sellers or manufacturers until it first contacted defendant in January, 1989. This conscious inattention on the part of Warner–Lambert towards private label brands that have virtually the same trade dress as McCrory's brand severely undercuts plaintiff's claim that it faces irreparable damage.

Plaintiff contends that its inaction vis-a-vis other private label sellers should not enter into an assessment of the potential for irreparable harm caused by defendant's alleged infringement. To support this proposition, plaintiff relies upon *Kinark Corp. v. Camelot, Inc.,* 548 F.Supp. 429 (D.N.J.1982); such reliance is misplaced. First of all, *Kinark* did not address an application for preliminary injunctive relief, and thus the court was not faced with a preliminary claim of irreparable harm. Second, to the extent *Kinark* did examine the issue of third party infringement, the court gave no broad pronouncements on the effect of inaction toward other alleged infringers. Instead, the court stated:

> The plaintiff's lack of a consistent effort to prevent others from using the mark, especially where most of the other uses have been commercially insignificant to plaintiff's marketing efforts, has no bearing on the rights of the parties before the court.

*Kinark,* 548 F.Supp. at 443. *Kinark* thus supports the entirely reasonable principle that a plaintiff does not lose its rights versus an infringer merely because it took no action against previous insignificant infringers.

In contrast, Warner–Lambert chose to ignore private label sales of mouthwash, in trade dresses substantially similar to defendant's product, by many of the largest retail chains in the country, such as K–Mart, Rite–Aid, Revco and CVS; with such sales preceding defendant's sales by a peri-

od of years. This inaction certainly tends to diminish any claim by Warner–Lambert that McCrory's amber mouthwash now poses a palpable threat of irreparable harm.

Of course, Warner–Lambert's inaction toward other private label sellers does not resolve the ultimate issue of McCrory's alleged infringement on Listerine's trade dress; nor does it necessarily imply that the Listerine trade dress has become the industry standard. However, on the issue of irreparable harm, Warner–Lambert's prior inaction against other retailers is particularly relevant; not only does it suggest that Warner–Lambert does not feel especially threatened by potentially infringing private label brands such as McCrory's, but also Warner–Lambert's prior inaction against other major retailers' use of the disputed trade dress dilutes the equity of the court now using its coercive powers, on the basis of an incomplete record, to preliminarily enjoin defendant from selling the type of product plaintiff has idly watched other retailers sell for years. In this context, a court must be careful not to allow its equitable powers to be used for business needs unrelated to the legal principles underlying an action. Thus, Warner–Lambert's prior inaction against other possible infringements on the Listerine trade dress strongly militates against this Court employing its equitable powers pending the final outcome of the case.

### (b) Warner–Lambert's Delay in Bringing an Action Against McCrory

■ Apart from any inaction toward third parties, a plaintiff's undue delay in commencing an action against the named defendant can also defeat a claim of irreparable harm necessary for the issuance of a preliminary injunction. *See, e.g., Reedco, Inc. v. Hoffman La Roche, Inc.,* 667 F.Supp. 1072 (D.N.J.1987). Defendant has pointed to two periods of delay by plaintiff prior to bringing the current action: the period from June, 1988 until January, 1989, representing the time defendant began sales of its mouthwash until plaintiff warned defendant of the alleged infringement; and the period between March 16, 1989 and June 6, 1989, which represents

the time from McCrory's rejection of plaintiff's demands until plaintiff actually brought suit.

During this second period of time, plaintiff undertook to commission a study of possible consumer confusion between Listerine and McCrory's private label brand. This type of good faith preparation for litigation should not be used to subsequently bar plaintiff from obtaining injunctive relief.

In contrast, plaintiff's seven month delay in contacting defendant after McCrory's first began selling its private label mouthwash can be taken as a factor tending to minimize Warner–Lambert's claim of irreparable harm. Although Warner–Lambert contends it had no knowledge of McCrory's product until the discovery by plaintiff's own counsel in January, 1989, this contention would appear somewhat doubtful in light of Warner–Lambert's practice of sending personnel to conduct field checks of retail stores and inspect Listerine displays. Millheiser Dep. at 42–43, 126–27. It also seems doubtful that industry leader Warner–Lambert could have no knowledge that its own customer and major retailer, McCrory, was selling a product that Warner–Lambert now contends poses the danger of irreparable harm. *See Citibank,* 756 F.2d at 275 ("It strains one's credulity to argue that a major financial institution such as Citibank, with all its resources and information sources, could not establish before mid-September, 1984 that a potential competitor had opened a branch more than ten weeks earlier near the heart of Citibank territory.").

Aside from the issue of Warner–Lambert's knowledge, the seven month period from June, 1988 to January, 1989, during which Warner–Lambert did not seek any injunctive relief, is otherwise significant enough to affect plaintiff's demonstration of irreparable harm. See *Citibank,* 756 F.2d at 275 (ten week delay); *Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F.Supp. 976 (S.D.N.Y.1989) (three month delay); *Allen Organ Co. v. CBS Inc.,* 230 U.S.P.Q. 479, 1986 WL 4901 (S.D.N.Y.1986) (seven month delay). It should be understood that plaintiff's six-month delay does not necessarily rise to the level of laches and preclude plaintiff from seeking permanent injunctive relief; yet on the issue of whether Warner–Lambert faces irreparable harm warranting preliminary relief, Warner–Lambert's failure to warn McCrory of possible infringement until seven months after McCrory's introduction of its mouthwash does significantly weaken Warner–Lambert's attempt to demonstrate irreparable harm. *Citibank,* 756 F.2d at 276 ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.").

In sum, Warner–Lambert's inaction for a number of years against other possible infringements on the Listerine trade dress by many of the nation's largest retail chains, taken together with Warner–Lambert's failure to move against McCrory for a period of months, conclusively refutes plaintiff's claim of irreparable harm.

### (2) *Likelihood of Success on the Merits*

Plaintiff alleges that defendant is in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)[3] and N.J.S.A. 56:4–1.[4]

---

**3.** Section 43(a) of the Lanham Act provides as follows:

> Any person who shall affix, apply or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or de-

scription or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

**4.** N.J.S.A. 56:4–1 provides that:

Both statutes create a cause of action for unfair competition and include the common law tort of unprivileged imitation. The federal statute is not significantly different from the New Jersey law of unfair competition and the two can be treated alike for analytical purposes. *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir.1986).

Section 43(a) of the Lanham Act provides a cause of action for unprivileged imitation and infringement of a product trade dress. *American Greetings Corp.,* 807 F.2d at 1130; *SK & F Co. v. Premo Pharmaceutical Laboratories,* 625 F.2d 1055, 1057, 1065 (3d Cir.1980). In order to succeed on such a cause of action, the party seeking protection must demonstrate:

> that the feature or overall combination of features imitated is non-functional, that it has acquired secondary meaning, and that members of the consuming public are likely to confuse the source of the product bearing the imitated feature or combination.

*American Greetings Corp.,* 807 F.2d at 1141 (citing *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.,* 747 F.2d 844, 850 (3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984)).

Consideration of the above factors leaves the Court unconvinced that plaintiff will be likely to succeed on its unfair competition claims.

### (a) Functionality of the Listerine Trade Dress

 A product trade dress or a feature of a trade dress can be protected from infringement only if the trade dress or feature is not primarily a functional and useful addition to a product and instead serves as a means of identifying the source of the product. The Third Circuit has framed the issue of functionality by stating: "The essence of the question is wheth-er a particular feature of a product or service is substantially related to its value *as a product or service,* i.e. if the feature is part of the 'function' served, or whether the primary value of a particular feature is the identification of the provider." (Emphasis in original). *United States Golf Association v. St. Andrews Systems Data Max,* 749 F.2d 1028, 1033 (3d Cir.1984).

 Any assessment of functionality must focus on the trade dress, as a whole, as well as on component features of the trade dress. *American Greetings Corp.,* 807 F.2d at 1143. A combination of features can be protectable even if one feature may itself be functional; however, a defendant cannot be enjoined from using the functional features of the combination of features comprising a plaintiff's trade dress. *Id.* at 1144.

 The Listerine trade dress is made up of a number of features: the amber color liquid; the clear, waisted bottle; the black cap; and the white label with the American Dental Association seal of approval. Taking the amber color first, the Court finds that the amber mouthwash color is functional and cannot be protected as a trade dress feature. As a general proposition, colors are not ordinarily protectable features of a trade dress. *See Freixenet,* 731 F.2d at 153 (". . . colors are not protectable."); *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1382 (9th Cir.1987). Beyond this, the amber color has taken on a particular significance in the mouthwash industry. An amber liquid signifies an unflavored, medicinal mouthwash; as opposed to a red liquid signifying cinnamon flavor, a blue liquid signifying peppermint, and a green liquid signifying mint flavor.

Exhibits put before the Court by both defendant and plaintiff confirm that unflavored, medicinal mouthwash is uniformly colored amber; and this appears true no matter what the bottle shape is.[5] Thus,

---

No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trademark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals.

**5.** The Rite Aid, Parklane, Woolworth and Pathmark brands of unflavored mouthwash are all colored amber. These were all submitted by plaintiff.

Warner–Lambert can have no monopoly on the use of an amber color for unflavored mouthwash.

■■■■ The significance of a mouthwash's color necessarily implies that it can be packaged in a clear bottle. The shape of that bottle, however, may be protectable if it is not itself functional. McCrory's contends that the waisted bottle shape aids handling of the bottle when a product user has wet hands, which often may be the case with mouthwash garglers. Warner–Lambert maintains that this is a specious argument. The Court remains skeptical that McCrory adopted a waisted bottle for the benefit of slippery-handed mouthwash users; however, a waisted bottle would appear to have such an attribute, and improving the handling of a product does bear on its functionality: "A product's trademark or trade dress is non-functional if that trade dress does not affect the product's purpose, performance or economy of processing, *handling* or use." (Emphasis added). *CBS, Inc. v. Logical Games, Inc.*, 220 U.S.P.Q. 434 (E.D.Va.1982) (citing § 742 Restatement of Torts, 1938), *aff'd*, 719 F.2d 1237 (4th Cir.1983).

Apart from improving bottle handling, the waisted shape may help signify that the amber colored liquid is mouthwash rather than some other amber colored household product such as shampoo or soap.

■■■■ The fact that the waisted bottle may aid in handling a product identification does not necessarily imply that Warner–Lambert cannot ultimately prove that the primary value of the waisted bottle is to identify the product provider; but the Court is unpersuaded at this time that Warner–Lambert has made a sufficient showing that it is likely to prevail on the merits on the issue of the waisted bottle shape.[6]

■■■■ The black cap of the Listerine bottle is almost certainly unprotectable, as it is merely a color. Finally, McCrory's self-awarded seal of approval is not an infringement on Listerine's seal of approval since such a seal is functional, in that it connotes some type of inspection or standard of approval.

In sum, the amber color feature of Listerine's trade dress, as well as the black cap, clear bottle and seal of approval are likely to be found non-protectable. Only on the issue of the waisted bottle shape is it conceivable that Warner–Lambert will be successful in proving infringement; but the likelihood of this is not so great as to support the issuance of preliminary relief.

### (b) Secondary Meaning

■■■■ If a court finds the features of a trade dress are non-functional, then a plaintiff will prevail on an infringement claim if the non-functional features are also found to have acquired secondary meaning, that is, "if the purchasing public associates the dress with a single producer or source rather than just the product itself." *First Brands Corp.*, 809 F.2d at 1383. A finding of functionality will ordinarily preclude issuance of an injunction even if some consumer confusion will result; however, the Third Circuit has also held that: "if the functional feature or combination is also found to have acquired secondary meaning, the imitator may be required to take reasonable steps to minimize the risk of source confusion." *American Greetings Corp.*, 807 F.2d at 1141.

■■■■ To establish that secondary meaning has attached to the Listerine trade dress, Warner–Lambert relies upon the extensive advertising and promotional costs Warner–Lambert has expended over the years. Such reliance is entirely proper and is a common method for establishing secondary meaning. See, *e.g.*, *First Brands Corp.*, 809 F.2d at 1383. However, these advertising and promotional activities must involve what is termed "image advertising," meaning the ads must feature the trade dress itself. *Id.*

**6.** The Court notes that further discovery may be helpful on this issue, particularly as to the precise method Warner–Lambert arrived at the present bottle shape. Also relevant may be evidence that McCrory could adopt an alternative bottle shape equally beneficial to product users with wet hands.

██ Warner–Lambert's task of establishing that Listerine's advertising has featured the disputed trade dress is complicated by the actual packaging of Listerine bottles in the cardboard overwrap. Plaintiff maintains that all print ads and 70% of T.V. ad time display the actual bottle; however, there has been no discovery as to this issue, and defendant has also raised the point that even when the bottle is displayed, it is not clear if it is just the label or the entire bottle shape that is observable. There is also no evidence that any Listerine ads have ever sought to stress the shape of the bottle as a way of fostering consumer identification. *See First Brands Corp.*, 809 F.2d at 1388 ("Prior to the hearing before the district court, [plaintiff] did not attempt to engender consumer identification with the yellow, F-style jug. It did not, for example, urge consumers to look for the 'familiar yellow jug'.").

Neither this Court or defendant disputes the vast sums Warner–Lambert has expended in promoting Listerine, but "a large expenditure of money does not in itself create legally protectable rights." [citation omitted]. *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970). Plaintiff must demonstrate that the advertising and promotion has prominently and consistently displayed the entire Listerine bottle, and not just the label or overwrap. At this point in the proceedings, Warner–Lambert has not convinced the Court of this fact and therefore has not established a likelihood of success on the merits as to the issues of secondary meaning.

### (c) Consumer Confusion

A critical issue in any unfair competition claim is the possibility of consumer confusion as to the source of a product or service. *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1465–66. The Third Circuit has enumerated a set of factors related to this issue, consideration of which may be helpful to a court in determining the likelihood of consumer confusion in the context of either a trade mark or trade dress infringement action:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 823–24 (D.N.J.1980). Although these factors may be helpful in determining the likelihood of confusion, the Third Circuit has stated that they need not all be considered "when some are dispositive." *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151–52 (3d Cir. 1984).

██ A review of the above factors leaves the Court unconvinced that plaintiff has made a sufficient showing of likely consumer confusion. Of particular importance is the fact that on store shelves Listerine can be readily distinguished from McCrory's house brand because Listerine is sold in a distinctive overwrap. Furthermore, the price difference between the two products is not only a product difference in itself, but also prompts McCrory to bring this price difference to the consumers attention through the prominent use of "compare and save" signs on shelves in which the products appear, further distinguishing the two products from each other in the minds of prospective consumers. The Court also takes cognizance of the fact that a McCrory's shopper, as with any shopper

in such a retail store chain, has likely been exposed to generic or discount house brands before, and when walking through a McCrory's store and observing the many "compare and save" signs, is not likely to be misled by the McCrory's mouthwash brand.

 The only example of actual consumer confusion provided by plaintiff is the experience of plaintiff's own counsel, which, in the absence of cross-examination, can be accorded only limited probative value because of the party's obvious allegiance to plaintiff. Finally, plaintiff's submission of a consumer survey that purportedly establishes the likelihood of consumer confusion between Listerine and McCrory's private label brand does not provide a sufficient basis in and of itself for a finding that plaintiff is likely to be able to prove consumer confusion. Defendant has submitted two affidavits by researchers that challenge the validity of plaintiff's survey. *See* Affidavits of Jacob Jacoby and Henry D. Ostberg. In particular, defendant challenges the survey's failure to display the two products with the compare and save shelf sign that is found in most McCrory's stores, and the failure of the survey to use regular McCrory's shoppers. Of course, the Jacoby and Ostberg affidavits do not necessarily foreclose plaintiff's use of the Guideline survey at a later stage in the proceedings; however, the affidavits do cast sufficient doubt on the survey's results to preclude the Court from relying on the survey to find plaintiff is likely to succeed on the merits.

(3) Balancing of Equities and the Public Interest

In considering any motion for preliminary injunctive relief, a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it. *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985).

 The Court has previously touched upon the equities of imposing an injunction on defendant in the earlier discussion of irreparable harm. *See supra* at p. 394.

Specifically, the Court finds that plaintiff's failure to move against other private label brands of mouthwash packaged almost identically to defendant's brand implicitly encouraged defendant to adopt the disputed trade dress. Thus, it would now be unfair to preliminarily enjoin defendant from selling its mouthwash brand. Plaintiff's relief, if any, will have to come after a full disposition on the merits. This would not appear to pose any substantial threat to Listerine's annual sales of $172 million, considering that McCrory's entire present inventory of private label antiseptic mouthwash is worth only $100,000. Baldassarre Aff. ¶ 20.

 Finally, the Court finds the public interest does not tip the scale in favor of granting a preliminary injunction. Public policy is served by allowing a party to acquire and maintain a reputation for good quality and to protect that image in the minds of consumers by preventing confusion as to the source of a particular product. However, purely functional features of a product or those representing an industry standard should not be allowed to be monopolized by a single manufacturer. Given the current state of the record in this case, and the uncertainty as to the merits of plaintiff's position, the Court finds the public interest is best served by allowing McCrory to sell its lower priced antiseptic mouthwash pending the outcome of this action.

### III. CONCLUSION

The Court finds that plaintiff has not adequately demonstrated it faces irreparable harm or is likely to succeed on the merits of this action. Moreover, a weighing of equities and the public interest leads the Court to conclude that preliminary injunctive relief is not called for in this case. Therefore, plaintiff's motion for a preliminary injunction will be denied.