**TRANSFER PRINT FOILS,
INC., Plaintiff,**

v.

**TRANSFER PRINT AMERICA,
INC., Defendant.**

**Civ. No. 88–2851.**

United States District Court,
D. New Jersey.

July 21, 1989.

---

Lerner, David, Littenberg, Krumholz & Mentlik by Roy H. Wepner and Keith E. Gilman, Westfield, N.J., for plaintiff.

Carpenter, Bennett & Morrissey by John J. Peirano, Jr., Newark, N.J., and Leydig, Voit & Mayer by Lawrence S. Wick and Dennis Schlemmer, Chicago, Ill., for defendant.

HAROLD A. ACKERMAN, District Judge.

## I. INTRODUCTION

In this unfair competition and infringement action, plaintiff, Transfer Print Foils, Inc., presently seeks to enjoin defendant, Transfer Print America, Inc., from continued use of the name Transfer Print and defendant seeks the entry of summary judgment in its favor.

The Court of Appeals for the Third Circuit has "recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue." *Williams v. Curtis–Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982). In the case at bar, the parties have indicated to this Court that with the exception of testimony from two witnesses, John Legat and Michael Bier, they would rest on their written submissions. Hence, in reaching my decision, I have evaluated the testimony as well as the voluminous documentary and deposition evidence also submitted in support of and in opposition to the various requests, and, based on the same, I enter the following findings of fact and conclusion of law pursuant to Federal Rule of Civil Procedure 52.

## II. FINDING OF FACT

### A. Transfer Print Foils, Inc.

Plaintiff, known since its inception in 1978 as Transfer Print Foils, provides surface decorating machines, materials and related technical services to distributors and manufacturers who require designs or words placed on their products and packaging. Harry Parker Decl. at Paragraph 3. To create the desired decoration, plaintiff uses the process of "hot stamping" whereby an image or word is placed on a package by using heat to transfer to a particular surface, foil, which bears or is in the shape of the image. The results are high quality,

durable decorations. *Id.* at Paragraph 16; Plaintiff's Exhibit 22.

Plaintiff did not invent the process it uses nor did it create the phrase "transfer printing." Harry Parker Dep. at Pages 93, 157–58. Indeed, various patents owned by other individuals and/or entities disclose the technologies of transfer printing. *See* Defendant's Exhibits 35, 45, 48, 49, 56–65, 108–132.[1]

Those knowledgeable in the advertising and packaging field know that plaintiff is involved in the "decorating industry," which is broken into various subgroups such as hot stamping, which is the process plaintiff uses, and pad printing, which, as will be discussed *infra*, is the technique defendant uses to decorate its clients' products. Albert Raymond Flint Dep. at 47, 69, 70–71, 84, 111, 120; Philip Stokes Dep. at 9, 27–28; Harry Parker Dep. at 10, 42, 84, 93; Mary Hoffman Dep. at 4–5, 10, 14, 17, 84; Art Maynard Dep. at 12–16, 22–24, 61, 66–67; Joseph Alloco Dep. at 5, 8, 10, 13, 50–51; Heinz Grob Decl. at Paragraph 6; Tamas Frecska Decl. at Paragraph 3; Art Peck Decl. at Paragraph 4; David Ettelson Decl. at Paragraph 4; Paul Mouland Decl. at Paragraph 4; Bob Waitts' Decl. at Paragraph 5; George Nagel Decl. at Paragraph 4; Siegbert Wagner Decl. at Paragraph 4; Defendant's Exhibits 17, 96, 98, 99, 103, 105; Exhibit A to Plaintiff's Response to Defendant's Request for Admissions. Most printing jobs can be performed by either method, although the finished image may be different. Albert Raymond Flint Dep. at 97, 100–01; Tamas Frecska Decl. at Paragraph 3.

Plaintiff has used the names Transfer Print Foils and Transfer Print as well as the acronym TPF in connection with its surface decorating business as well as in its advertisements, on its trucks, signs and business stationery. Harry Parker Decl. at Paragraph 4; Plaintiff's Exhibits 1–25. The initials TPF is a registered mark, but the name Transfer Print Foils is not. Plaintiff's Response to Defendant's Request for Admissions Nos. 96, 98.

Plaintiff spends approximately $200,000 per year on advertising and promoting its products and services. Harry Parker Decl. at Paragraph 5; Mary Hoffman Decl. at Paragraph 2. In addition to placing ads in trade magazines, plaintiff distributes promotional literature and attends various trade shows and exhibitions. *See, e.g.,* Plaintiff's Exhibits 8, 24, 46.

Those in the industry have come to associate the phrase "transfer print" with plaintiff. Art Maynard Dep. at 70, 112; Marc Woontner Dep. at 34; Albert Raymond Flint Dep. at 94–95.

Since its inception, plaintiff has enjoyed annual sales increases, and in 1988, had net sales of over $24.5 million. Harry Parker Decl. at Paragraph 7; Mary Hoffman Decl. at Paragraph 3.

Among plaintiff's clients are American Greetings, Hallmark, Avon, Oleg Cassini, Revlon, A.C. Delco, Zenith and Biccardi Liquor. Harry Parker Decl. at Paragraph 2.

### B. *Transfer Print America, Inc.*

Defendant, formerly known as Tampo Print America, is the exclusive United States distributor of products produced by Tampo–Print, GMBH, a German manufacturer of pad printing products. Harry Parker Decl. at Paragraph 9; Plaintiff's Exhibit 27A. Pad printing is a process whereby an image is transferred with liquid ink from a plate, which bears an engraving or the image, to another surface. In an article written by Heinz Grob, an officer of the defendant, he acknowledges that the pad printing technique for decorating surfaces competes with other decorating methods, such as hot stamping. *See* Plaintiff's Exhibit 72. Moreover, at the hearings before this Court, defendant's president, John Legat, acknowledged that within the decorating industry there is competition among the various methods of decorating. John Legat Hearing Testimony at 28–30.

Both plaintiff and defendant have advertised their products in the same publications and have promoted their products and

---

**1.** In addition, various companies have used the phrase "transfer printing" to describe a heat based method used, for example, to decorate textiles. Art Maynard Dep. at 58, 63.

made presentations at the same trade shows and regional conferences, and are listed under the same subheading within trade-related indices. *See, e.g.,* Plaintiff's Exhibits 24–26, 33–35, 41–43, 45; Harry Parker Decl. at Paragraphs 10(a)–(c) and 13(a)–(c); Mary Hoffman Decl. at Paragraph 5; Joseph Alloco Decl. at Paragraph 3; Harry Parker Dep. at 234–35; Mary Hoffman Dep. at 66–70, 79, 82; Joseph Alloco Dep. at 15–18, 22. Both companies are capable of decorating the same products, albeit using different techniques, and are not only able to, but indeed seek to cater to some of the same clients. *See* Plaintiff's Exhibit 102; Harry Parker Decl. at 10(g); Marc Woontner Decl. at Paragraph 3; Plaintiff's Exhibit 27, 56 at 9–10; Plaintiff's Response to Defendant's Request for Admissions Nos. 100, 104–106; Harry Parker Dep. at 84; John Legat Decl. at Paragraph 14. For instance, a comparison of plaintiff's and defendant's customer mailing lists reveals an overlap in their client bases and sales targets. Debra Blake Decl. at Paragraph 3.

In addition, defendant is affiliated with a company that also provides hot stamping services and products. Harry Parker Decl. at Paragraph 17; Plaintiff's Exhibit 41; Defendant's Exhibit 103; John Legat Hearing Testimony at Page 19. In fact, defendant has referred to this entity in its own promotional literature as a provider of hot stamping related products. *See* Defendant's Exhibit 103; Plaintiff's Exhibit 41.

*C. Name Change*

In the summer of 1987, officers of plaintiff received a report that defendant had planned to change its name from Tampo–Print America, Inc. to Transfer Print America. Marc Woontner Dep. at 8–11. In December of 1987, defendant sent, and plaintiff received a general trade announcement, which memorialized that the name change was to take place and become effective January 1, 1988. *See* Plaintiff's Exhibit 38; Joseph Alloco Dep. at 26–28; Mary Hoffman Dep. at 86–88.

Following its name change, defendant expended $140,000 on the preparation and distribution of promotional items, modified its trade show exhibits at a cost of $130,000, as well as spent $80,000 in advertising its name change and $20,000 on sign changes. John Legat Decl. at Paragraph 4–7. *See also* Mr. Legat Hearing Testimony at 18 in which he stated that his company spent $300–400,000 in connection with the name change.

Since the name change defendant has referred to itself in its promotional literature and at trade shows as both Transfer Print and Transfer Print America. *See* Plaintiff's Exhibits 40, 43 and 45.

In addition, third parties have referred to defendant as Transfer Print. *See, e.g.,* Plaintiff's Exhibit 47; *but see* John Legat Decl. at Paragraph 8.

Apparently, defendant had notice of plaintiff's use of Transfer Print in its corporate name prior to the adoption of the name Transfer Print America. *See* Plaintiff's Exhibit 56 (Interrogatory No. 5); Heinz Grob Decl. at Paragraphs 7–10. Specifically, the record reflects that prior to the name change, officers of the defendant were aware of Plaintiff's existence. Heinz Grob Decl. at Paragraph 7. *See also* Mr. Legat Hearing Testimony at 19, 37–38 where he admitted that he was informed of the existence of a company named Transfer Print Foils in December of 1987. In addition, defendant was constructively aware of Plaintiff's existence since at least 1983, as both companies had advertised in the same journals, *see* Plaintiff's Exhibit 22, 23; Harry Parker Decl. at Paragraphs 10(c) and (d), had been listed in the same index of decorating material and equipment suppliers, *see* Plaintiff's Exhibits 22–23, and participated in and/or were among the sponsors of various trade shows such as the 1983 Plastics Fair and the 1986 and 1987 Regional Technical Conferences. *See* Plaintiff's Exhibits 33, 34; Harry Parker Decl. at Paragraphs 10(a), (b) and (e); Heinz Grob Decl. at Paragraph 8–9. *But see* Plaintiff's Exhibit 56. In addition, Mr. Legat owns part interest in a company of which plaintiff is a customer. *See* John Legat Hearing Testimony at 19.

Despite this knowledge, and because "everything [related to the name change] was already so far in motion and it was decided ... [that we would] proceed[ ] with the name change." John Legat Hearing Testimony at 20.

Defendant explains that it changed its name from Tampo–Print America because Tampo–Print, GMBH objected to the use of its name when it discovered that defendant did not sell only the products manufactured by that German company but rather also sold products that other companies manufactured. John Legat Decl. at Paragraph 2. In response to Tampo–Print, GMBH's complaint, defendant decided to select a new name which did not imply a foreign source for its products. *Id. See also* Heinz Grob Decl. at Paragraph 3; Haide Baumann Decl. Paragraph 5. *See also* Plaintiff's Exhibit 56 at 10 (Response to Interrogatory No. 20).

As a result of defendant's adoption of the words "transfer print" in its name, by letter dated March 24, 1988, counsel for plaintiff notified counsel for defendant of its belief that defendant's use of the phrase "transfer print" infringed on its property rights therein. *See* Plaintiff's Exhibit 36. By letter dated April 8, 1988, counsel for defendant informed plaintiff that it believed the words "transfer print" were generic and unprotectible. *See* Plaintiff's Exhibit 37.

Because defendant continued to use the name Transfer Print America, on June 15, 1988, plaintiff filed the present action and on May 19, 1989, applied for preliminary injunctive relief.

### D. Confusion

In support of its request for such extraordinary relief, plaintiff has presented declarations, deposition testimony and documents that reflect that defendant's use of the name "transfer print" has resulted in actual confusion. The evidence reflects various examples of confusion.

In the first example, when Ray Flint of United Silicone, Inc. learned that defendant had changed its name to Transfer Print, he initially believed that defendant had modified its name because plaintiff had purchased defendant and had entered the pad printing business. Raymond Flint's Decl. at Paragraphs 2–3; Raymond Flint Dep. at 70; Marc Woontner Dep. at 12. *See also* Mr. Woontner Dep. at 31–32 where he recounted that Glen Regan, an employee of United Silicone, independently drew the same conclusion. Relatedly, when James Schacht of Center Line Manufacturing saw the name Transfer Print America, he concluded that plaintiff and defendant had combined efforts to provide two services to the plastic decorating industry. James Schacht Decl. at Paragraph 3; Marc Woontner Dep. at Paragraphs 8–10.

In the second example, the record reflects that even publishers of trade journals believed that the name Transfer Print America referred to plaintiff. Specifically, in 1988, both plaintiff and defendant participated in the National Plastics Exhibition ("NPE"). Prior to the show, NPE published previews of exhibiting companies in issues of two trade publications published by McGraw–Hill, Modern Plastics and Modern Plastics International. The previews generally delineated the name of the company, a summary of its product and/or technology, its booth number as well as a reader service number which readers could use to obtain additional information. Despite plaintiff's participation in the show, the publisher ran previews only for defendant on the belief that its listing of Transfer Print in Modern Plastics International, and/or Transfer Print America in Modern Plastics made reference to plaintiff. Philip Stokes Decl. at Paragraph 2; Harry Parker Decl. at Paragraph 14; Mary Hoffman Decl. at Paragraph 6(a); Philip Stokes Dep. at 30; Mary Hoffman Dep. at 94–97; Defendant's Exhibit 33.

Not only was the publisher confused but readers of both the previews and subsequent advertisements believed that the listing and/or advertisements bearing the name Transfer Print or Transfer Print America related to or were placed by plaintiff rather than defendant. Proof of this is evidenced from the fact that certain readers circled the reader service number as-

signed to defendant in the NPE preview and other publications and sent the cards to plaintiff. *See* Plaintiff's Exhibit 48(a)–(k), 50(a)–(f); Mary Hoffman Decl. at 6(b) and (c).

The third example of confusion has been reflected in the confusion of certain exhibitors at the NPE '88 who initially believed that defendant's booth was that of plaintiff's. Art Maynard Decl. at Paragraphs 2–3; Art Maynard Dep. at 35–36, 68–70, 71–72; *see also* Defendant's Exhibit 15.

The fourth group of examples of actual confusion are manifested in the fact that plaintiff has received inquiries regarding defendant's advertisements, received purchase orders from companies, such as Titleist and Sony, directed to defendant and received checks as payment for products actually purchased from defendant. *See* Plaintiff's Exhibits 49, 54–55, 57–59, 91; Defendant's Exhibit 31; Allen Behrle Decl. at Paragraphs 2–3; Joseph Alloco Decl. at Paragraph 4; Joseph Alloco Dep. at 37–39, 48, 50, 54–55. Plaintiff has also received questions regarding products ordered from defendant by companies, such as Ford Motor Company. Joseph Alloco Decl. at Paragraph 4; Marc Woontner Decl. at Paragraph 3; Marc Woontner Dep. at 21–24. In addition, certain clients have misidentified certain customer representatives as serving defendant when they were in fact serving the plaintiff. Raymond Flint Dep. at 105–07.

In a fifth set of examples of actual confusion, hosts of trade shows have called plaintiff on the assumption that plaintiff, rather than defendant, was participating in a show that in point of fact, plaintiff did not even attend. *See* Plaintiff's Exhibits 51, 52, 53; Mary Hoffman's Decl. at Paragraph 6(d) and (e); Joseph Alloco Decl. at Paragraphs 4(a) and (b); Mary Hoffman Dep. at 113, 116; Joseph Alloco Dep. at 37–39, 41, 48, 50, 54–55.

Furthermore, defendant has admittedly received inquiries regarding the possible existence of an affiliation between itself and plaintiff as well as questions concerning products or services that plaintiff provides. *See* Plaintiff's Exhibit 87 at 7–9; Defendant's Exhibits 31. In addition, defendant has mistakenly received at least two orders for foil or other hot stamping products that are available from plaintiff and not defendant. *See* Plaintiff's Exhibit 87 at 9–10.

Defendant has argued that these examples of confusion are based on rumor or were the result of clerical errors and hence are diminimus.

### E. Generic

Moreover, defendant contends that the name at issue is generic. In support of its claim that the name is generic and nonprotectible, defendant has adduced evidence that other entities doing business in New Jersey or listed with the United States Patent and Trademark Office use the words "transfer" and "print" or "transfer printing" in their names or use these words in their commercial literature to describe their products or services. *See e.g.,* Defendant's Exhibit 5, 37, 94, 136; John Bello Decl. at Paragraphs 6–7; Don Clark Decl. at Paragraphs 1, 3; Ed Humphrey Decl. at Paragraph 2; Carel Jongbloed Decl. at Paragraph 1; Israel Rakower Decl. at Paragraph 2, which reveal the following names of companies with the words "transfer" and "print," "printing" or "prints" in them: Tanaka Transfer Printing Co., Transfer Fashion Print, Bonotex Transfer Printing, Blue Ribbon Transfer Printers, Penn Transfer Printing, Imperial Transprint Corp., H & E Transfer Printing, Silver Transfer Print, Com-Tex Transfer Printing, Speed Tex Transfer Printing, Chung Ming Print Transfer, Trans/Print Associates, Trans Bay Printing, Transprints, Transamerica Printing, Transil Print, Transfapant, Transprint International, Transoprint. *See also* Gary Innocenti Decl. at Paragraph 2 and John Bello at Paragraph 5, which reflects from 1975–79, a company existed in Fair Lawn, New Jersey known as Transfer Print of America.

Plaintiff admits that despite knowledge of other companies with the words "transfer printing" in their name, plaintiff did not seek to enjoin the use of the name. *See* Plaintiff's Response to Defendant's Re-

quest for Admissions No. 6, 8, 11, 13, 15 and 29.

In addition, defendant has adduced copies of excerpts from various trade and non-trade dictionaries and journals as well as lay publications that certain references to the phrase "transfer printing." *See* Defendant's Exhibits 6–8, 12–13, 40–43, 65, 67; as well as Exhibits AF, AG, AI, AP, 46, 52 to Defendant's Request for Admissions (transfer print as a technology); Exhibits 47, AO, AM, AN to Defendant's Request for Admissions (pad transfer printer as a product); Defendant's Exhibit 50, 93 (transfer printing as an industry); Defendant's Exhibit 55 (transfer printing as a catchall phrase for a variety of processes including hot stamping and pad printing); Defendant's Exhibit 68, 73, 75, 76, 79, 88, 89, 95 (transfer prints that are art); Exhibits to Defendant's Request for Admissions AA, AB, AC, Defendant's Exhibits 69, 70–72, 74, 77, 86 (transfer printed plates and earthware); Defendant's Exhibit 83 (thermal transfer printing); Defendant's Exhibits 80, 81, 82, 84, 85, 87, 90–92 (heat transfer printing on textiles or fabrics with transfer prints); Defendant's Exhibit 44 (description of process of heat transfer printing).

Defendant has also offered declarations of various purported industry participants regarding their understanding of the term "transfer printing" as one that describes a process of taking an image or material and transferring it to the surface of another product. Heinz Grob, Art Peck, Siegbert Wagner, David Ettelson, George Nagel, Paul Mouland and Bob Waitts Decls.

Finally, defendant has pointed out that the plaintiff has used the words "transfer printing" in its promotional literature and advertisements to refer to certain processes and the words "hot transfer print product" to refer to certain products, and does not use the phrase to identify itself. *See* Defendant's Exhibit 9, 21, 50 at Paragraphs 1, 51.

It should be noted, however, that such phraseology may have been adapted to create an image and promote the name of plaintiff's product, Mary Hoffman Dep. at

5, 10, 13–15, 31–32, or because such phrases are used within the industry to broadly describe the process of decorating a product with an image. Interestingly, defendant, when known as Tampo–Print, may have made similar use of the phrase "Tampo Printing" to arguably convey a similar message. *See also* Plaintiff's Exhibit 28–30, 32, 73, 77; Defendant's Exhibits 98, 106.

Defendant contends that all of the above evidence, as well as the results of a survey conducted by Coopers & Lybrand, support its contention that the name in issue is generic and nonprotectible. *See* Defendant's Exhibit 107; Michael Bier Decl. With respect to the survey, which plaintiff contends was conducted in a defective manner, 48.6 percent of the 401 respondents reported that in their opinion, the phrase "transfer print" constitutes a generic name; 31.6 percent of the respondents identified the word as a trade name; and 19.6 percent recognized the phrase both as a generic reference and as a trade name. *Id.* From these figures, the pollsters' survey concluded:

> "that a significantly larger proportion view transfer print primarily as a generic term rather than a trade name. It is clear from the sample poll that the relevant universe view the term as not having primary significance as a trade name. Rather, including the 19.7 percent who view 'transfer print' as equally a trade name and a generic name, a large majority, 68.3 percent of the relevant universe view the term as a generic name."

*See* Defendant's Exhibit 107 at 10.

Having reviewed the study and heard the testimony of its designer, Michael Bier, several factors have caused me to conclude that the results of the survey should not be given dispositive effect.

First, most of the 401 respondents polled were selected from defendant's customer/mailing lists, which has 1737 entries. Mr. Bier acknowledged on both days that he testified that he would have preferred a more representative sampling which included a list of plaintiff's customers. *See, e.g.,* Michael Bier Hearing Testimony at 108–11.

There has been some dispute as to whether or not defendant or its counsel was in possession of such a list at a time that it could have been used by Coopers & Lybrand. The proof on this issue is not entirely clear, but, in any event, I find that the survey sample was not as representative as it could have been.

Second, I have been persuaded both by the declaration of Michael Rappaport and the testimony adduced at the hearing that the questions posed to the respondents did not conform to acceptable standards. Michael Rappaport Decl. at Paragraphs 5–6, 11–13; Michael Bier Hearing Testimony of July 20, 1989, where it became apparent that questions 4(a) and 6 were remarkably similar and arguably this may have influenced the responses.

Third, the designers of the survey were aware both that the survey was going to be used for litigation and of defendant's contention that the name "transfer print" was generic or highly descriptive. Michael Bier Cross–Examination Testimony dated July 20, 1989. Relatedly, both the interviewers and respondents were informed that the purpose of the study related to litigation surrounding the use of certain terminology. Michael Bier Decl., Exhibit 1 at Page 2; Michael Bier Testimony during Direct Examination dated July 20, 1989; *see also Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978).

Fourth, the interpretation Coopers & Lybrand has given to the statistical results is not the only viable one that exists. Specifically, rather than combining the responses of those who considered the phrase both generic and trade name with those who view it only as generic, one could combine the responses of those in the former group with those who identified the phrase as only a trade name and conclude that more than half those surveyed identified the phrase at least as a trade name. Indeed, during the second day of his testimony, Mr. Bier acknowledged that the responses in the category of those who identified the phrase as being both generic and a trade name was a swing category, but that he combined those responses with the respondents who identified the phrase as a generic one to "disprove" that the phrase is a trade name.

For all of these reasons, I find that the conclusions of the survey are not entitled to great weight.

Interestingly, in the face of its contention that the name "Transfer Print" is generic, defendant has admitted that it applied to register its trademark with the United States Patent and Trademark Office ("PTO"). *See* Plaintiff's Exhibit 60, 60A; Defendant's Exhibit 133. According to its application, defendant informed the PTO that it "has adopted and is using the following trademark":

"TRANSFERPRINT AMERICA AND DESIGN"

\*    \*    \*    \*    \*    \*

"for the following goods:
    printing machines and parts for printing machines...."

This application further states that the
    "trademark is used in the following manner: on labels and name plates affixed to the goods."

*See* Plaintiff's Exhibit 98. The design for which he sought protection interestingly contains only the words "transfer print" written in lower case letters.

In the application, John Legat, President of defendant, declared that "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark." *Id.*

On May 5, 1988, the examining attorney of the PTO who reviewed defendant's application mailed defendant a copy of the office's official action. In that document the PTO informed defendant that registration of the name "Transfer Print" was refused because (1) it was likely to be confused with the phonetic equivalent of a previously registered mark, "Transfaprint"; and (2) the proposed mark is descriptive.

On September 15, 1988, three months after the within civil action was instituted, defendant submitted its response to these conclusions and amended its application to add the following disclaimer: "Applicant disclaims exclusive rights to the terms

'transfer' and 'print' apart from the mark as shown." *See* Plaintiff's Exhibit 96. In support of its request, defendant asserted that

"Applicant's mark in the instant case comprises the words 'transfer' and 'print,' a geometrical design, a distinctive type style, a background contrasting with the words and reversing the word and background shading. The additional elements provide ample basis for distinguishing the instant mark."

*See* Plaintiff's Exhibit 96 at 7. Hence, defendant apparently has recognized that the components of its mark are not protectible, but sought to obtain protection for the combination.

On January 25, 1989, the examining attorney responded to the amendment and concluded (1) that the disclaimer was not made in the proper form since the terms disclaimed should not have been disclaimed separately, but rather must be disclaimed as a composit; (2) even upon submission of a proper disclaimer, the mark at issue is not distinctive enough to make it registerable; and (3) the literal portion of the logo is nearly identical in sound and meaning to the registered name Transfaprint and the design elements to the logo do not eliminate the similarity. *See* Plaintiff's Exhibit 97.

### F. Summary

In addition to the observations of the examining attorneys, a comparison of the names Transfer Print Foils and Transfer Print America and the evidence before me reveals:

1) both companies use the words "transfer" and "print" in their names;

2) both annex a third word; plaintiff annexes the word "foils," in part to connote the materials it uses to create the printed image; *see* Plaintiff's Exhibit 21, while defendant annexes the word "America" for a geographic connotation.

3) both entities refer to themselves in their literature and logos, and have been referred to by others simply as "Transfer Print." *See, e.g.*, Plaintiff's Exhibit 38, 47, 78.

4) both are in the decorating industry and, like others in the field, both use the words "transfer printing" in their promotional literature.

5) both advertise in the same publications, appear at the same trade shows, target their efforts at a similar client base and provide similar services, albeit via different techniques.

On this record of similarity and actual confusion, plaintiff seeks to enjoin defendant from use of the name Transfer Print America and argues that it has protectible trade name rights in the names Transfer Print and Transfer Print Foils. Plaintiff also argues that the names are suggestive and have developed secondary meaning and defendant's use of same has caused actual confusion. Plaintiff contends that in light of this confusion and the similarities between plaintiff's and defendant's channels of trade, advertising media and sales targets, it has established a reasonable probability of succeeding on the merits of its claim that defendant has violated Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), infringed upon its common law interests in the name and engaged in unfair competition. Plaintiff argues that defendant's conduct has caused plaintiff irreparable harm, which will continue absent equitable injunctive relief, and that defendant will suffer comparatively minimal harm if the injunction is issued and the public interest will be served.[2]

In response to plaintiff's request defendant argues that the name "Transfer Print" is generic and is nonprotectible and, hence, plaintiff is entitled to no relief and

---

**2.** Plaintiff also contends that the issuance by the State of New Jersey of a certificate of authority to transact business in this State under the name Transfer Print does not excuse defendant's conduct since such state action does not provide defendant rights that supersede another entity's common law rights in its name.

In addition, plaintiff asserts that defendant should be estopped from asserting that the name "Transfer Print" is not protectible in light of its own efforts to register "Transfer Print" as its trade mark.

defendant is entitled to summary judgment. Defendant further asserts that plaintiff's claim of irreparable harm is barred by the delay with which it filed its request for preliminary injunctive relief and its likelihood of success on the merits is unsupported given the generic nature of the name at issue, absence of intent on the part of defendant to trade off plaintiff's name, the sporadic and deminimus episodes of confusion, the sophistication of the customers, and the difference in both the trade channels used and the names themselves. Finally, defendant argues that it will suffer extensive injury if it is forced to change its name.

## III. CONCLUSIONS OF LAW

As this matter is before me on an application for preliminary injunctive relief, the criteria set forth in *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982) are applicable. Specifically, the moving party must show (1) a reasonable probability of eventual successes on the merits; and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Failure to show either of these elements "must necessarily result in the denial of a preliminary injunction." *Id.* at 1143. Moreover, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction; and (4) the public interest." *Id.* (quotation marks and citations omitted). *Accord American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir.1986); *Kirshner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982) (en banc); *Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

Hence, under this analysis, I must first consider the merits of movant's claims.

■ Plaintiff seeks equitable relief under Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a) as well as based upon the common law claims of unfair competition and trademark infringement. The elements of these statutory and common law claims are the same; and the purpose of both is to prevent one person from passing off his goods as the goods of another. *See American Steel Foundries v. Robertson*, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317 (1925), *cited in Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F.Supp. 571, 579 (D.N.J.1985).

■ In order to prevail on a statutory or common law infringement claim, plaintiff must establish:

1) that it owns a name that is a valid, legally protectible mark; and

2) that the infringer's subsequent use of a similar mark to identify its own goods is likely to cause the consumers of the goods to be confused, deceived or mistaken as to the origin of the goods.

*See Eagle Snacks, supra,* at 579; *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1362 (D.N.J.1981); *see also SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980); *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225, 1228 (3d Cir.1978).

■ A mark's eligibility for trademark status, and consequently the degree of protection it should be accorded, is divided into four classes: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir.1986); *Educational Development Corp. v. Economy Co.*, 562 F.2d 26, 28 (10th Cir.1977); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976); *Eagle Snacks, supra,* at 580; *Estate of Presley, supra* at 1364; *see also* 1 J. McCarthy *Trademarks & Unfair Competition* Section 11.1 (2d ed. 1984). The degree of protection increases as one moves up the order of these categories. *See, e.g., Eagle Snacks, supra,* at 580.

■ In describing each of these categories, as the Court of Appeals for the Third Circuit observed in *A.J. Canfield, supra,* at 296–97:

"Arbitrary (or fanciful) terms ... bear 'no logical or suggestive relation to the actual characteristics of the goods;' suggestive terms ... suggest rather than

describe the characteristics of the goods; descriptive terms ... describe a characteristic or ingredient of the article to which it refers, and generic terms ... function as the common descriptive name of a product class.

\* \* \* \* \* \*

If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. [*Keebler Co. v.*] *Rovira Biscuit,* [*Corp.*], 624 F.2d [366] at 374 n. 8 [ (1st Cir.1980) ]. If we hold a mark descriptive, a claimant can still establish trademark rights, but only if it proves that consumers identify the term with the claimant, for that identification proves secondary meaning. *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978). The distinction between suggestive and descriptive may also dictate different standards for determining its scope of geographic protection. *See* 2 McCarthy, *supra,* Sections 26:11, at 307–08.

Finally, if we hold a designation generic, it is never protectible because even complete 'success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name.' *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Therefore, evidence that a generic term is identified with one producer, indicative of a secondary meaning for a descriptive term, proves only what courts call 'de facto' secondary meaning. Such evidence indicates only that the producer has dominated the market for a product (often because it has had a patent). *See Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *Schulmerich Electronics, Inc. v. J.C. Deagan, Inc.,* 202 F.2d 772, 776–78 (C.C.P.A.1953); *J. Kohnstam Ltd. v. Louis Marx & Co., Inc.,* 280 F.2d 437, 440 (C.C.P.A.1960); *Folsom & Tepley, supra,* at 1351 (same evidence can establish secondary meaning or de facto secondary meaning); 1 McCarthy, *supra,*

Section 12:15, at 432. Accordingly, although some courts have established a sliding scale, demanding stronger proof of secondary meaning as a designation becomes more descriptive, *see American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir.1974); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 849–50 (5th Cir. 1970), *see generally* 1 McCarthy, *supra,* Section 15:12, at 687–85, evidence of secondary meaning is not even relevant if the term is arbitrary, suggestive or generic. *See, e.g., Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 938 n. 6 (7th Cir.1986) (discounting study that indicated secondary understanding of 'liquid control' as not relevant to whether term is generic)."

Thus, even when a generic term has developed secondary meaning, it is not protectible as a trademark since to do so would prohibit a competitor from identifying his goods as what they are. *See Eagle Snacks, supra,* at 580, *citing CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir.1975).

In this instance, defendant claims that the name "Transfer Print" is generic. Professor McCarthy sets forth the clearest test for genericness in his treatise. There he wrote that:

"A mark answers the buyer's questions 'Who are you? Where do you come from? Who vouches for you?' But the name of the product answers the question, 'What are you?' .... [G]eneric designations tell the buyer what the product is, not where it comes from."

1 J. McCarthy, *supra,* Section 12:1 at 520 (citations omitted), *cited in Eagle Snacks, supra,* at 580. Put differently, a generic term is one that is primarily associated with a product or service rather than a producer or service provider. *See Nabisco Brands, Inc. v. Quaker Oats Co.,* 547 F.Supp. 692, 698 (D.N.J.1982), *citing, Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 120, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938). *See also A.J. Canfield, supra,* at 305–06, where the Third Circuit observed that the genericness of a particular name

depends, in part, on how the relevant product category is defined since, "a generic term is one that refers to the genus of which the particular product is a species." *See Park N' Fly v. Dollar Park & Fly*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). In short, "whether the term that identifies the product is generic ... depends on the competitors' need to use it." *See A.J. Canfield, supra*, at 306.

■■■ As plaintiff bears the burden of proving that its unregistered name is within a protectible category, it must prove a lack of genericness. *See A.J. Canfield, supra*, at 297; 1 J. McCarthy, *supra*, at Section 12.2, at 528. In this case, I find that plaintiff has demonstrated a likelihood of success in proving that the name at issue is not generic. Plaintiff sell products or provides services that relate to the surface decorating industry. The participants in this industry decorate products by transferring a desired image to a particular surface through the use of methodologies such as pad/ink printing or hot stamping. Plaintiff provides products and services related to hot stamping. Its customers need not use the phrase "transfer print" to identify the product plaintiff sells, particularly since variants of the phrase are used within the decorating industry to refer to various modes of marking surfaces. Thus, the phrase as used here does not tell the consumer what the product or service is nor is the phrase necessary to identify the product. In addition, there is no evidence that there is a product or service known as transfer print. For these reasons, I find that the name "Transfer Print" is not generic.

Defendant's citation to other publications, such as dictionaries, trade journals, newspapers, patents or other corporate names which include the words "transfer" and "print" or some variant thereof provides little support for its claim of genericness with respect to the term "transfer print," as most of the references do not even include these identical words, but rather include combination of these words with the suffix "ing" or "ed" or refer to subjects unrelated to the industry involved in this litigation.

■■ Plaintiff asserts that not only is the name nongeneric but that it is suggestive and, hence, protectible. As the court acknowledged in *A.J. Canfield, supra*, at 297, "A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods." If the term is considered suggestive, evidence of secondary meaning is not even relevant.

The phrase "transfer print," as used by plaintiff, connotes that plaintiff engages in some sort of marking or printing through the transfer of a substance to another surface. Use of the word "foils" in its name further suggests that the images are made through the use of foils. Taken together, it is arguable that no imagination is required for a potential consumer to reach a conclusion about the nature of plaintiff's product or services, and, as such, Transfer Print, as applied to the word "foils" and as used in the relevant industry, is not suggestive. *See id.* at 298.

Hence, plaintiff is entitled to protection if it proves that the name "Transfer Print" is descriptive, that is "it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods," *id.* at 297; *Eagle Snacks, supra*, at 580, and has obtained a secondary meaning. *Id.* at 580, 582. *See also Estate of Presley, supra*, at 1364; *Scott Paper, supra*, at 1228; *Salton, Inc. v. Cornwall Corp.*, 477 F.Supp. 975, 988 (D.N.J.1979).

As I noted in *Eagle Snacks, supra*, at 580, "secondary meaning is the association in the public's mind between a product and its source which occurs when an inherently non-distinctive designation changes to being distinctive of the particular product." Moreover,

"Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin.... Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests

that the products originate from a single source.... Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark."

*Scott, supra,* at 1228 (citations omitted).

Plaintiff has carried its burden of proving a likelihood of success in demonstrating that the mark is descriptive and has acquired a secondary meaning. Plaintiff has shown that the phrase at issue, "Transfer Print," conveys an idea that the plaintiff provides a service and related products for transferring an image from one surface to another and thus it is descriptive.[3]

■ Plaintiff has also shown a likelihood of success in proving that the name has acquired a secondary meaning. Plaintiff has used the name continuously since 1978, spends more than $200,000 per year on advertising and the relevant consuming public has come to associate the name with plaintiff's products. James Schacht Decl. at Paragraph 2; Ray Flint Dep. at 11; Art Maynard Dep. at 70. The large advertising budget and steady increase in sales reflect continuous use of the name in the market. Finally, evidence of actual confusion, as will be discussed *infra,* further reflects the likelihood that the name has obtained secondary meaning.

As the plaintiff has used this descriptive name for over 10 years and has proven a likelihood of proving that it has a secondary meaning, plaintiff has a protectible interest. In light of this interest, I must next consider if plaintiff has shown a likelihood of success in proving infringement.

■ The test for infringement of common law trademarks is the same as the test for statutorily registered ones; that is, "whether the defendant has made a subsequent unauthorized use of marks, which are the same or similar to those marks used by the plaintiff...." *Estate of Presley, supra,* at 1366. The defendant's use of the words "transfer print" in its name,

indisputably without plaintiff's permission, is the unauthorized use of marks that are identical to those used in plaintiff's name. Hence, plaintiff has satisfied the infringement element of the test.

For such infringement to be actionable, plaintiff must demonstrate that "defendant's use creates a likelihood of confusion as to the source of [the] goods or services" sought. *Id.* at 1366. Courts analyze the following factors in considering whether a likelihood of confusion exists between the products in question.

1) the degree of similarity between the owner's mark and the alleged infringing mark.

2) the strength of the owner's mark.

3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.

4) the length of time the defendant has used the mark without evidence of actual confusion arising.

5) the intent of the defendant in adopting the mark.

6) the evidence of actual confusion.

7) whether the goods, if noncompeting, are marketed through the same channels of trade and advertised through the same media.

8) the extent to which the targets of the parties' sales efforts are the same.

9) the relationship of the goods in the minds of the public because of the similarity of function.

10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in defendant's market.

*Scott Paper, supra,* at 1229; *Estate of Presley, supra,* at 1367.

With respect to the strength of plaintiff's mark I note that "the term strength as applied to trademarks refers to the distinctiveness of the mark or more precisely, its tendency to identify the goods sold under

---

**3.** Moreover, I note that at Page 35 of its brief defendant acknowledged that the words "transfer print" are descriptive and at Page 34 specifically stated that the name "Transfer Print America, Inc." was selected because "it told customers that the company was involved with transfer printing ... it was close to the original name [Tampo–Print] and the initials were the same."

the mark as emanating from a particular, although possibly anonymous source." *See Estate of Presley, supra*, at 1367. As stated previously, the evidence supports plaintiff's contention that the name "Transfer Print" has been linked to goods and services plaintiff sells or has been known to identify the goods related to hot stamping as emanating from a particular source.

Moreover, the two names at issue, Transfer Print Foil and Transfer Print America, each have the same first two words and the record reflects that these entities refer to themselves and have been referred to by others only by those two words. In fact, in various examples of defendant's logo, only the words "transfer print" appear, without any designation that it identifies the defendant company. While defendant has annexed the word "America," as geographical designation, "the geographical designation tacked on the infringing name does not avoid infringement of the entire name." *See Schering Corp. v. Schering Aktiengesellschaft*, 667 F.Supp. 175, 189 (D.N.J. 1987). Thus, even use of the word "America" with the phrase "transfer print" does not cure the infringing nature of defendant's conduct in its use of the phrase "transfer print."

▮ Furthermore, both entities market products within the surface decorating industry, advertise them in the same media and promote them at the same trade shows. A comparison of the parties' mailing lists reflect similarity in the targets of their marketing efforts. Additionally, Mr. Legat, president of defendant, admits that the two companies provide competing modalities for achieving a desired end—a decoration on packaging and products.

Finally, while defendant has used its mark only since January of 1988, actual confusion arose almost immediately. For example, in the spring of 1988, the NPE promoters and attendees believed that either defendant was plaintiff or had become affiliated with plaintiff. Moreover, since then customers of both entities have sent purchase orders intended for one to the other. Furthermore, both have received inquires regarding products that the other

provides, and plaintiff has even received checks intended for defendant to pay for products purchased from defendant.

Hence, given the similarity of trade channels, sales targets, names and in light of the evidence of actual confusion, with respect to the descriptive name which has attained a secondary meaning, I find that plaintiff has demonstrated a likelihood of success on the merits of its statutory and common law claims and has thereby satisfied the first element for obtaining injunctive relief.

▮ I must next consider if plaintiff will be irreparably harmed if its request for preliminary injunctive relief is not granted. As a general rule

"in the context of [trademark] infringement and unfair competition, including Section 43(a) of the Lanham Act, the plaintiff who demonstrates a likelihood of confusion as to the source, and thus, likelihood of success on the merits, will have formed a strong basis for showing irreparable injury...."

This results because:

A plaintiff who has demonstrated [trademark] infringement and unfair competition faces the probability of lost trade and appropriation of its good will. The damages in such a case by their very nature are irreparable and not susceptible to adequate measurement."

*See Estate of Presley, supra*, at 1380 (citations omitted). As Judge Learned Hand explained,

"If another uses [a mark], he borrows the owner's reputation whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask."

*Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928).

In the present case, it is inferable that plaintiff's mark is widely known based upon the size of its sales revenues, the amount it spends on promotional activities, and from the statements of those in the

industry that the words "transfer print" refers to plaintiff. Plaintiff has a significant stake in continuing to ensure that the quality of its products with which the product has become identified. If defendant is allowed to use the "transfer print" designation within its name, which has been demonstrated to have caused actual confusion as to the source of the products and/or services "plaintiff would be harmed seriously by the deprivation of its ability to control the nature and quality of a [product] which the public believes it provides." *See Estate of Presley, supra,* at 1381. Furthermore, plaintiff is entitled "to be protected from the probable damage to its goodwill if" the purchasers believe that plaintiff produced the product bought and were dissatisfied. *Id.* at 1381. "Such a loss of intangible value cannot be accurately measured and compensated in damages" and, hence, results in irreparable harm. *Id.*

For all of these reasons, I also conclude that the plaintiff has demonstrated that it would continue to be irreparably harmed absent the issuance of preliminary injunctive relief.

Despite defendant's contention to the contrary, I do not find that plaintiff has not delayed in seeking the instant relief in a manner that cuts against its claim of irreparable harm.

■ It has been recognized that delay or laches may operate as a defense to the issuance of an injunction when, in light of all the existing circumstances, it appears that a plaintiff has unreasonably delayed application for relief and prejudice to the opposing party has thereby resulted. *Reedco Inc., et al. v. Hoffman–LaRoche, Inc.,* 667 F.Supp. 1072, 1082 (D.N.J.1987), *citing Sobosle v. United States Steel Corp.,* 359 F.2d 7, 12–13 (3d Cir.1966). *See also Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1258 (3d Cir.1974) where the court stated that to establish a defense of laches defendant must show: (1) inexcusable delay in instituting suit; and (2) prejudice resulting to the defendant from such delay. The laches defense may be asserted in suits for trademark infringement. *Reedco, supra* and citations therein.

■ Defendant does not have a valid laches defense in this case. First, while laches is an affirmative defense that must generally be pled, or it is waived, *see* Federal Rule of Civil Procedure 8(c); 5 C. Wright & A. Miller, *Federal Practice & Procedure,* Section 1277, and while a review of defendant's affirmative defenses reveals that laches is not one that it has chosen to assert in its answer, the law of this Circuit permits parties to raise affirmative defenses by motion. *Id.* and cases cited therein at 329 n. 13. As such, I shall address the assertion of laches as a bar to plaintiff's request.

■ A review of the record reveals that plaintiff had not unreasonably delayed in informing defendant of its objection to defendant's conduct as well as in filing the instant action. Specifically, defendant adopted its new name on January 1, 1988, and was formally notified of plaintiff's objections to its use by letter dated March 24, 1988. Following defendant's written response thereto, dated April 8, 1988, and defendant's continued use of the objectionable name, on June 15, 1988, plaintiff commenced the instant action.

The original pleadings reflect that as part of the desired relief plaintiff prayed for the issuance of an injunction. Thus defendant has been on notice of the relief plaintiff has sought since June of 1988. The crucial inquiry, however, is not whether the movant considered a preliminary injunction necessary at the time of filing the complaint, *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1264 (3d Cir.1985), rather, "the relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *Id.* The instances of actual confusion have continued to be reported even days before the instant hearings. The fact plaintiff applied for the issuance of a preliminary injunction 11 months after the case was instituted does not demonstrate unwarranted delay, particularly since plaintiff is currently in danger of suffering irreparable harm at the present time. Finally, and of equal import, defendant has not shown that it has been prejudiced by any delay that may have

transpired. Hence, I do not find that any purported delay militates against plaintiff's claim that it has suffered or will suffer irreparable harm in the absence of equitable injunctive relief.

With respect to the harm to defendant that may be caused by the issuance of the injunctive relief, I note first that the record reflects that defendant expended approximately $300,000 to promote its name change and modify its brochures, business stationery and the like. It is likely that defendant would incur similar expenses to change its name. Thus, where a name change would cost defendant money, defendant could seek to recover expenditures related to the name change by an award of monetary damages if defendant ultimately prevails. *See Estate of Presley, supra*, 1381. This monetary expenditure, however, is outweighed by its ability to recoup same if successful as well as the likelihood that defendant's designation infringes on plaintiff's rights and the existence of actual confusion between the marks. Moreover, prohibiting defendant from using the name "Transfer Print" does not prevent it from continuing to sell its products or offer its services, so long as it does so under another name.

Thus, the relative hardship to defendant from the issuance of equitable relief is outweighed by the potential harm to plaintiff if defendant is not preliminarily enjoined from those activities that have caused confusion and infringed upon plaintiff's statutory and common law rights.

Finally, the public interest in the enforcement in the trademark laws will be advanced by the issuance of injunctive relief. The public is entitled to rely on valid marks as identifying the products it has come to associate with that mark. In short, not only is the owner of the mark entitled to not have another person pass off his goods as those of the owner, but also the public is entitled not to be confused or deceived by improperly appropriated marks.

Moreover, public interest favors fair competitive practices and opposes deceptive ones and this interest is advanced by assuring that a potential buyer is aware that a product bearing a particular protectible mark is connnected with the source with which it has become associated.

As these interests are advanced by the grant of preliminary injunctive relief in the case at bar, the fourth element for obtaining relief I find is satisfied as well.

Hence, as plaintiff has demonstrated a likelihood of success on the merits of its claim, the likelihood of irreparable harm to it absent such relief, which outweighs the harm to defendant if preliminary injunctive relief should issue, and as the public interest will be advanced by granting such relief, I shall grant plaintiff's request for preliminary injunctive relief and order that it post a bond in the amount of $350,000. Defendant is ordered to change its name within thirty days of the date on which the bond is posted.

For all the above reasons, I shall grant the plaintiff's request for issuance of preliminary injunction and deny defendant's motion for summary judgment.[4]

---

4. As I have found, plaintiff has demonstrated a likelihood of success in proving that the name "Transfer Print" is nongeneric, defendant's assertion that there is an absence of any factual issue as to its claim that the name is generic is without basis and, therefore, I shall deny the motion for summary judgment.